UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MCC NON FERROUS TRADING INC.,
                                    Plaintiff,

    - against -

AGCS MARINE INSURANCE COMPANY,
                                    Defendant.

---

Civil No. 14-CV- *8302*

**COMPLAINT**

Plaintiff MCC Non Ferrous Trading Inc. ("Metallica" or "Plaintiff"), on its own

behalf and on behalf of all Assureds under the subject insurance policy, by its

undersigned counsel, alleges the following for its complaint against Defendant AGCS

MARINE INSURANCE COMPANY (d/b/a Allianz Global Corporate & Specialty)

("Allianz" or "Defendant"):

## NATURE OF THE ACTION

1.    This is an action for declaratory judgment and breach of contract arising

out of the failure and refusal of Allianz to honor its insurance coverage obligations under

an all-risk "Ocean Marine Cargo Policy" sold to Metallica.

2.    As a result of a cargo theft of copper scrap metal during transit from the

Philippines, Metallica suffered a loss fully covered under the terms of the all-risk cargo

insurance policy sold by Allianz.

3.    Metallica brings this action against Allianz to enforce its insurance

coverage rights.  Metallica seeks both declaratory relief and a recovery of damages for

Allianz' breach of contract.  Allianz has unreasonably failed and repeatedly refused to

honor its insurance coverage obligations for Metallica's insurance claim.

## PARTIES

4.      MCC Non Ferrous Trading Inc. is an "Assured" under the Allianz all-risk cargo insurance policy, is a related company of Metallica Commodities Corp. (also an "Assured" under the all-risk cargo policy), and is incorporated under the laws of New York, with its principal place of business located in White Plains, NY.

5.      Upon information and belief, defendant Allianz is a corporation organized under the laws of Illinois with its principal place of business located in Chicago, Illinois. Upon information and belief, defendant Allianz conducts its marine insurance underwriting and claims handling activities in substantial part from its New York offices located in lower Manhattan, NY.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over Allianz because Allianz was, at all relevant times, a corporation authorized to transact business in the State of New York and/or conducted continuous and substantial business in the State of New York.

7.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because Metallica is incorporated and has its principal place of business in New York and Allianz is incorporated and has its principal places of business in Illinois, and the matter in controversy exceeds the sum or value of $75,000.  In the alternative, this Court has jurisdiction over this action pursuant to 28 U.S.C. § 1333 in that it arises from the breach of duties and responsibilities under a policy of marine insurance sold and delivered to Metallica by Allianz to facilitate ocean transit of cargo.

8.      Personal jurisdiction is proper in New York because Allianz agreed under the terms of the all-risk marine cargo insurance policy at issue to submit to the jurisdiction of a court within the Southern District of New York.   Personal jurisdiction

-2-

also is proper in New York because at all relevant times, Allianz operated, conducted, engaged in or carried on a business or business venture in this state, there is the requisite nexus between the business and this Action, and because Allianz engages in substantial, and not isolated, activity within New York.  Further, venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Metallica maintains its key business operations, including those involved in the purchase of insurance from Allianz (and the purchase of copper scrap that is the subject of this insurance coverage dispute) in New York.

9.      Upon information and belief, venue is proper in this district because the Allianz all-risk marine cargo policy was delivered in this jurisdiction through Allianz' "New York Branch Office".

## BACKGROUND

### Metallica's Purchase of Copper Scrap: Shipment from Philippines to Rotterdam

10.     Metallica's core business is metals and minerals trading.  Metallica trades both non-ferrous and ferrous metal containing materials, as well as fertilizers to the Agri Industry. Metallica's services include the trading of residues, by-products, ores and complex concentrates from both the ferrous and non-ferrous metal industries. These include Copper, Nickel, Lead, Zinc, Tin, Cobalt, Silver and Gold.

11.     Metallica has been involved in the trading of all non-ferrous metals and specializes in the commercial recycling of residues and byproducts generated by the mining, metallurgical and chemical processing industries.

12.     As part of Metallica's normal course of business, it purchases copper scrap and sells the same material to another buyer or user.

-3-

13.     In October 2013, Metallica entered into a contract dated October 16, 2013 with a South Korean company to purchase copper scrap from the Philippines that was being sold by an entity named McQan Corporation ("McQan"). McQan's principal, J.Y. Lee, was a gentleman who Metallica had done business with before on several occasions and continues to do business with.

14.     The contract governing the purchase of the copper scrap was entitled "Agreement # M1313-P". It obligated McQan to, among other things, sell to Metallica "Copper wire scrap as per ISRI Berry" that was to be "free of plastic and other debris", in an approximate amount of Three-Hundred Metric Tons (300 MT) (hereinafter referred to as the "October 16, 2013 Contract").

15.     As part of its due diligence prior to entering into the October 16, 2013 Contract with McQan, Metallica asked for confirmation of the existence of the copper scrap to be purchased from McQan in an amount over 300 MT.

16.     McQan's principal, Mr. Lee, a metallurgist and Ph.D., confirmed that he personally witnessed copper scrap in amounts at least equal to 300 MT, that he could sell to Metallica. McQan provided Metallica with photographs of the copper scrap that he personally inspected in the Philippines.

17.     Additionally, a pre-shipment inspection of the copper scrap was conducted by SMC Inspection Services on or about October 4, 2013.

18.     Unbeknownst to Metallica at the time, SMC Inspection Services issued a "Pre-Inspection Report" dated October 5, 2013, which estimated the quantity of "Millberry Copper Scrap" at "350 MT".

-4-

19.     Upon receiving confirmation from McQan that he would be able to sell 300 MT or more in copper scrap to Metallica, Metallica's CEO, Mr. Glendon Archer, signed the October 16, 2013 Contract on October 13, 2013.  McQan signed the October 16, 2013 Contract on or about October 17, 2013.

20.     The October 16, 2013 Contract required the shipment of copper wire scrap within 14 days of Metallica's payment of a performance bond to McQan and after inspection of the copper scrap by Metallica or a representative of buyer.

21.     The cargo of copper scrap was originally to be delivered to Hamburg, Germany but was subsequently changed to delivery to Rotterdam, Netherlands.

22.     Metallica arranged to sell the cargo scrap purchased from McQan to a large European copper smelter, Aurubis AG Recycling.

23.     On October 17, 2013, Metallica wired the performance bond payment to McQan under the terms of the October 16, 2013 Contract.

24.     Thereafter, Metallica received an HSBC Payment Advice dated October 18, 2013 confirming that payment was made from Metallica to McQan in the amount of $207,476.15.

25.     During the last week of October, 2013, the loading of the copper scrap took place at a warehouse located in the metropolitan area of Manila in the Philippines.

26.     From October 24 through November 2, 2013, over 300 MT of the copper scrap was loaded into fifteen cargo containers measuring 15 feet by 20 feet.

27.     McQan employees and representatives, including a gentleman named Anthony Kim, a resident of Atlanta, Georgia, personally witnessed the actual loading of

-5-

the copper scrap into eleven of the fifteen containers and took photographs of the loading and transportation process, en route to the terminal at the Port of Manila.

28. The loading and transport of the first four containers with the copper scrap were personally witnessed by an individual named Vikash Thacker—a logistics consultant who is a resident of India. Mr. Thacker took photographs of the loading process and transport process.

29. During the loading process, eye witnesses inspected and photographed the copper scrap loaded into the cargo containers.

30. After each container was fully loaded with its respective share of the 300 plus MT of copper scrap, the containers were locked and driven to an area just outside the port terminal entrance. The containers were re-inspected and after verifying that the containers were still carrying the copper scrap load, they were sealed and driven through the port security entrance to the container yard for ocean transit to point of destination (Rotterdam).

31. It is believed that the loading of the copper scrap into the containers was performed by workers hired by an entity called Riverbend Enterprises of Quezon City, Philippines; the entity that sold McQan the copper scrap.

32. On or about November 14, 2013, Metallica made a second payment to McQan for the purchase of the cargo scrap under the October 16, 2013 Contract. Thereafter, Metallica received an HSBC Payment Advice dated November 15, 2013, confirming payment from Metallica to McQan in the amount of $1,606,473.97.

33. McQan subsequently provided Metallica with a "Stuffing Data" and "Tally Sheet" table which set forth the weight of each of the fifteen cargo containers. The

-6-

cargo scrap weight totaled 307.032 MT. The Stuffing Data was sent by McQan to Metallica on or about November 4, 2013.

### Theft of the Cargo Scrap

34.     Upon arrival of the vessel delivering the copper scrap containers to Rotterdam, five containers were delivered to Aurubis. At that site, Aurubis representatives and MCC's surveyor opened the five cargo containers and recognized that the copper scrap had been removed and replaced with construction materials and debris. Upon this revelation, the remaining 10 cargo containers were moved from the Rotterdam port to a warehouse in which they were inspected by MCC's surveyor with Allianz' investigator. The copper scrap in these containers similarly had been removed and replaced with construction materials and debris. Aurubis refused the shipment of cargo as delivered.

35.     The copper scrap cargo had been stolen during transit between the warehouse in the Philippines and arrival in Rotterdam. The containers' scrap cargo was replaced with worthless construction materials and debris.

36.     Pursuant to an inspection report issued in Rotterdam on December 18, 2013, the seals appeared to be un-tampered with and there were no visible signs of forced-entry into the cargo containers.

37.     Metallica notified McQan promptly of the cargo theft.

38.     McQan tried to contact Riverbend, the entity that sold McQan the copper scrap, but was unable to do so. Furthermore, the office address that McQan had for Riverbend as its principal business address turned out to be a vacated residence in the Philippines.

-7-

39.     As such, McQan both alerted the police department in the Philippines and also filed an insurance claim with the insurance company that purportedly had agreed to insure McQan's purchase and shipment of copper scrap.

40.     The insurance company, Charter Ping An, refused to pay the claim.

41.     Thereafter, insurer Charter Ping An, through its counsel, also indicated Charter Ping An's refusal to pay the claim for the stolen cargo, and alleged that it never had agreed to insure the cargo.

42.     Because McQan did not have the money to reimburse Metallica for theft of the cargo, and because Charter Ping An refused to honor any of its purported insurance coverage obligations, Metallica sought insurance coverage with Allianz under the all-risk cargo policy Metallica purchased.

43.     Allianz, without proper or valid justification, has refused to honor its insurance coverage obligations for Metallica's loss resulting from the theft of its copper scrap cargo.

### The All-Risk Policy

44.     Allianz sold an all-risk Ocean Marine Cargo policy to Metallica, policy number OC 91257500 (the "All-Risk Policy").

45.     The All-Risk Policy was in full force and effect at the time of the theft and at the time that the insurance claim was notified to Allianz by Metallica.

46.     The All-Risk Policy promised, among other things, to protect the Assureds' interests in scrap metals against "all risks of physical loss or damage from any external cause" (subject to certain exclusions that are not applicable to the subject insurance claim).  A true and correct copy of the All-Risk Policy is attached hereto as Exhibit A.

-8-

47.    Metallica purchased from Allianz insurance policy limits of $15,000,000.00 for the specific type of loss in question.

48.    Metallica paid Allianz all insurance premiums due and owing for protection of the copper scrap cargo it purchased, which Allianz accepted.

49.    Because the Allianz All-Risk Policy was an "open" marine cargo policy, Metallica provided information to Allianz about specific shipments that it wished to insure.

50.    As with all cargo insured with Allianz under the All-Risk Policy, Metallica inputs information concerning the shipment into Allianz' computer system.

51.    For this transaction, Metallica followed the normal and customary procedure and timely provided and input such information as sought by Allianz into Allianz' computer system.  This process was completed by Metallica in order to cover the shipment from the Philippines of copper scrap that Metallica purchased from McQan under the All-Risk Policy.

52.    Metallica paid, and Allianz accepted, the particular insurance premium that would be attributable to this cargo shipment.

53.    Under the All-Risk Policy Allianz sold, all shipments "by or to" Metallica or for "their account" are expressly covered, including "Scrap Metals."

54.    Metallica expressly insured with Allianz the copper scrap shipment at an amount of $2,325,766.75, and paid insurance premiums according to this sum.

55.    The All-Risk Policy also contains a "Valuation" clause at paragraph 18 which promises "CIF plus 10%" for scrap metals.

56.   By the plain terms of the All-Risk Policy, the shipment of the copper scrap cargo, and the theft thereof, are covered, thereby obligating Allianz to pay in full for Metallica's loss.

57.   Metallica intended and reasonably expected that it would have insurance coverage under the All-Risk Policy for a loss such as the one that is the subject of this dispute.

### *The Denial of Metallica's Claim*

58.   Metallica sought coverage under the All-Risk Policy for its losses resulting from the theft of its cargo of copper scrap which was stolen in transit from the Philippines.

59.   Metallica provided Allianz with timely notice of a loss sustained due to the cargo theft and Allianz has acknowledged receiving notice of the insurance claim (the "Claim").

60.   The loss is covered by the All-Risk Policy and is in excess of the applicable $1,000 deductible.

61.   After receiving notice of the Claim, upon information and belief, Allianz hired a German investigator based in Hamburg (Jochen Stuhmer of Reck & Co.) to gather information for Allianz to use in its determination of insurance coverage for Metallica.   Upon information and belief, Allianz hired an additional investigator to investigate the Claim, Jeffrey Starnes of G4S Compliance & Investigations.

62.   This "investigation" was apparently conducted in early 2014.

63.   On March 6, 2014, Allianz wrote to Metallica's insurance broker (Nausch Hogan & Murray, Inc. ("NHM")) and purported to "reserve its rights" based upon the "preliminary results" of Allianz' theft investigation.

-10-

64.     Allianz indicated that its preliminary investigation led it to believe that the loss of cargo was the result of "fraud perpetrated by the supplier at the point of origin." Allianz apparently was referring to the entity from which the seller, McQan, had purchased the copper scrap.

65.     In early May, 2014, Metallica still had not received payment of its Claim and did not know what the outcome was of Allianz' "investigation".

66.     Metallica's broker, NHM, subsequently followed-up with Allianz to request an insurance coverage determination and payment of the Claim by Allianz.

67.     By letter dated May 14, 2014, Allianz represented that although it was continuing its investigation, it was denying insurance coverage for the Claim.

68.     NHM requested that Allianz re-consider its coverage decision believing it in error.

69.     By letter dated May 30, 2014, Allianz refused to do so and refused to provide insurance coverage to Metallica.

70.     Subsequently, Metallica and NHM requested a copy of Allianz' Hamburg-based investigator's report.

71.     Allianz refused to share the investigator's report with Metallica or its insurance broker.

72.     Allianz during this time also raised numerous arguments not to pay Metallica's insurance claim, all of which are without merit and lack proper basis.

73.     Allianz argued that that the "intent" of the All-Risk Policy was purportedly not to cover losses caused by fraud.  This argument is without merit under an all-risk insurance policy under rulings from this District and this Circuit.

-11-

74.     Allianz also argued that the "Interest" clause at paragraph 6 of the All-Risk Policy was not satisfied due to the contractual terms between the seller of the copper scrap, McQan, and Metallica as buyer, because McQan was obligated to provide insurance coverage for the shipment of the cargo pursuant to a "C.I.F." clause.

75.     Allianz' interpretation of paragraph 6 is without merit.  The clause is satisfied as the copper scrap shipment in question comprised a "shipment[] by or to the Assured for their account. . . ."

76.     Nonetheless, Allianz represented that the clause's limitation for the purchase of goods "by the Assured on C.I.F. or other terms including insurance" barred coverage for the Claim.

77.     Allianz' interpretation, however, omits key words from the clause—which it drafted.

78.     These terms demonstrate that the "C.I.F." exclusion does not apply to Metallica's Claim as the policy expressly excepts such a limitation where "otherwise provided herein."

79.     Specifically, paragraphs 52 (Contingency Insurance for Assured as Consignee) and 53 (Difference in Conditions/Increased Value/Guarantee of Collectability) of the All-Risk Policy override the exclusionary language upon which Allianz relies.

80.     Paragraphs 52 and 53 of the All-Risk Policy are triggered by the Claim and provide coverage to Metallica as a purchaser—even in instances where the seller (McQan in this case) is charged in the first instance with arranging for cargo insurance.

-12-

81.     Paragraph 52 of the All-Risk Policy states: "This insurance is also specifically to cover goods purchased and paid for by the Assured on terms which do not obligate them to provide insurance, if there is a loss or damage from a peril insured herein, and the Assured cannot collect from the seller, insurance provided by the seller, or other party, because of refusal or inability to pay." Ex. A., ¶ 52 (emphasis added).

82.     Thus, Paragraph 52 is triggered because the seller was unable to pay, and Metallica could not collect from the insurance (in this case Charter Ping An) provided by "the seller" McQan.

83.     Paragraph 53 of the All-Risk Policy provides coverage for, among other things, "[a]ny perils not covered by other insurance but which are covered under the terms of this Policy[]" and instances where "the Assured cannot collect under other insurance for loss and or damage by perils covered under the terms of this Policy. . . ." Paragraph 53, by its terms, is also triggered by the circumstances of this Claim.

84.     Allianz also argued that there was not 307 MT of copper scrap but instead between "50 and 60 MT."

85.     Metallica and its broker NHM requested Allianz' evidence for this allegation but have received nothing from Allianz to support this theory.

86.     In June 2014, Metallica repeated its request for a copy of the report prepared by Allianz' investigator in Hamburg.

87.     On July 1, 2014, Allianz again refused to share the investigator's report.

88.     Conversely, Metallica cooperated fully with Allianz' investigation and provided Allianz with, among other things, photographic evidence of the copper scrap cargo at various points in the loading and transportation process.

-13-

89.     This evidence demonstrated 15 different and sealed cargo containers with a stated weight capacity of over 67,000 pounds each, loaded with copper scrap.

90.     Tellingly, Allianz' speculations over the actual quantity of copper scrap loaded into the containers do not appear to even affect its insurance coverage position as it refuses to reimburse Metallica for any part of the 60 MT of copper scrap that was stolen and which Allianz does not contest existed.

91.     Allianz is in breach of its insurance coverage obligations to Metallica because, among other things, it is a prohibited practice for an insurance company to fail to promptly settle claims, where liability has become reasonably clear, under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage.

92.     Allianz also based its denial of insurance coverage by arguing that the "Infidelity" exclusion at paragraph 58 of the All-Risk Policy applies to the Claim.

93.     The exclusion does not apply.

94.     Paragraph 58 states, "In no case shall this insurance cover loss or damage caused by or resulting from misappropriation, secretion, conversion, infidelity or any dishonest act done by or at the instigation of the Assured or other party of interest to the underlying purchase or sale transaction, or their employees or agents (carriers for hire excepted)." Ex. A.

95.     Allianz' attempted application of this exclusion fails as a matter of law and fact.

96.     There was never any infidelity "by or at the instigation of the Assured", the buyer of the copper scrap.

-14-

97.     There was no infidelity by McQan, the seller of the copper scrap.

98.     There was no infidelity by either McQan's or Metallica's respective employees or agents.

99.     Riverbend, which is the entity suspected of having a hand in the theft of the copper scrap cargo during transit, was not a "party of interest to the underlying purchase" transaction.  Nor was Riverbend an employee or agent of Metallica or the seller, McQan.

100.    The October 16, 2013 Contract between McQan as seller and Metallica as buyer makes no mention of Riverbend.

101.    Therefore, Riverbend is not a party to the sales contract between McQan and Metallica.

102.    Furthermore, prior to Metallica's purchase of the cargo from McQan, Metallica had never even heard of Riverbend, did not know they sold copper scrap to McQan, and had never (at any time) had communications or dealings with Riverbend.

103.    Allianz' arguments attempting to broadly apply the infidelity exclusion are improper under the law of this District and Circuit.  Under controlling law, exclusions from coverage—particularly all-risk insurance coverage—are construed narrowly, not broadly.

104.    Nevertheless, Allianz deliberately has pursued an unreasonable and otherwise improper application of the exclusion.

105.    Allianz was and is duty-bound to handle fairly and pay promptly Metallica's Claim.

106.    Allianz has failed in this regard without any justifiable excuse or valid basis in law or fact.

## COUNT I

### (Declaratory Judgment Regarding Coverage)

107.    Metallica repeats and re-alleges the allegations set forth in paragraphs 1 through 106 as though fully set forth herein.

108.    Allianz has failed and refused to provide coverage to Metallica for the Claim which is covered under the All-Risk Policy.  Such refusal by Allianz also includes amounts beyond just those covered under the "sum insured" by Metallica and that provided under paragraph 18 of the All-Risk Policy.  Allianz is also required to pay other sums including, but not limited to, disposal and storage fees incurred for the cargo delivered to Aurubis in Rotterdam, trucking costs, and inspection and surveying invoices.

109.    By reason of the foregoing, an actual and justiciable controversy exists between Metallica and Allianz regarding Allianz's obligations to provide coverage to Metallica for its loss.

110.    Plaintiff is entitled to a judicial declaration from this Court that: (i) Allianz is obligated to perform its contractual obligations under the All-Risk Policy, and (ii) that Metallica is entitled to coverage for the full amount of its loss resulting from the theft of cargo.

## COUNT II

### (Breach of Contract)

111.    Metallica repeats and re-alleges the allegations set forth in paragraphs 1 through 110 as though fully set forth herein.

-16-

nydocs1-1039067.1

112.   The All-Risk Policy constitutes a valid policy of all-risk insurance coverage between Metallica and Allianz, and its terms and conditions have been triggered to provide insurance coverage to Metallica.

113.   Metallica has complied with all conditions and satisfied all obligations precedent to coverage to the extent that they have not been waived or abrogated by Allianz' conduct, omissions or actions.

114.   All insurance premiums due under the All-Risk Policy have been paid, and thus, Metallica is rightfully entitled to the insurance coverage benefits of the All-Risk Policy for the Claim.

115.   Under the All-Risk Policy, Allianz is obligated to pay for the loss sustained by Metallica as a result of the theft of the copper scrap cargo.

116.   Allianz has breached its obligations under the All-Risk Policy by refusing to pay the Claim.

117.   As a result of Allianz' breach of its obligations under the All-Risk Policy, Metallica has been damaged in an amount to be determined at trial.

118.   As a result of its breach, Allianz is liable to Metallica for all losses resulting from the cargo theft including, but not limited to, hedging losses, unreimbursed costs associated with the storage, transportation and disposal of the cargo containers that arrived in Rotterdam without the purchased copper scrap.

119.   Additionally, Metallica is entitled to all insurance coverage provided under the All-Risk Policy in an amount not less than $2,325,766.75.  Allianz is also required to pay other sums including, but not limited to, inspection and surveying invoices.

120.     Metallica thus seeks all coverage and benefits owing under the All-Risk Policy, together with costs and disbursements of this action, consequential damages arising from Allianz' breach of its insurance coverage obligations, including, but not limited to, reasonable attorneys' fees, costs and pre-judgment and post-judgment interest.

WHEREFORE, Metallica prays for judgment as follows:

1.     On Count I, enter declaratory judgment in favor of Metallica, including declarations that: (i) Allianz is obligated to perform its contractual obligations under the All-Risk Policy, and (ii) Metallica is entitled to insurance coverage for the full amount of its losses;

2.     On Count II, a determination by this Court in favor of Metallica, awarding money damages, including but not limited to compensatory and consequential damages in an amount to be determined at trial; and

3.     On all Counts, pre-judgment and post-judgment interest, attorneys' fees, costs, and such other and further relief as the Court deems just and proper.

**Jury Demand**

Plaintiff demands a trial by jury on all counts so triable.

Dated:   October 16, 2014

By: _____
       Joshua Gold, Esq.
       Dennis J. Nolan, Esq.
       ANDERSON KILL P.C.
       1251 Avenue of the Americas
       New York, NY  10020
       Telephone:  212-278-1000

       *Attorneys for Plaintiff*
       *MCC Non Ferrous Trading Inc.*