# ANDERSON KILL P.C.

Attorneys and Counselors at Law

1251 AVENUE OF THE AMERICAS ■ NEW YORK, NY 10020
TELEPHONE: 212-278-1000 ■ FAX: 212-278-1733
www.andersonkill.com

**By ECF**

December 11, 2014

Hon. James C. Francis IV
United States Magistrate Judge
United States District Court
Southern District of New York
500 Pearl Street, Courtroom 18D
New York, New York 10007

> Re:  *MCC Non Ferrous Trading Inc. v. AGCS Marine Insurance Company*
> Case No.: 14 Civ. 8302 (PGG) (JCF)

Dear Judge Francis:

Pursuant to Judge Gardephe's October 21, 2014 Notice of Pretrial Conference in the above-referenced case,[1] the parties hereby submit this Joint Letter.

## Plaintiff's Description of the Case, Including the Factual and Legal Bases for the Claims Asserted

This action involves a dispute over insurance coverage for a stolen shipment of copper scrap cargo from the Philippines. MCC Non Ferrous Trading Inc. ("Metallica" or "Plaintiff") has brought suit for declaratory judgment and breach of contract arising out of the refusal of AGCS Marine Insurance Company ("Allianz") to cover the losses suffered by Metallica under an all-risk "Ocean Marine Cargo Policy" Allianz sold to Metallica (policy number OC 91257500).

In October 2013, Metallica entered into a contract with a South Korean company named McQan Corporation ("McQan") to purchase approximately 300 MT of copper scrap from the Philippines. Pursuant to a separate contract, McQan had acquired the copper scrap from Riverbend Enterprises ("Riverbend"), a company based in the Philippines. Metallica agreed to purchase the copper scrap from McQan and entered into a separate agreement to re-sell the copper scrap to Aurubis AG, a European entity ("Aurubis").

---

[1] The Pretrial Conference was scheduled for December 18, 2014 before District Judge Gardephe; however, Defendant's Counsel sought adjournment on November 20, 2014, and the parties consented to have all proceedings heard and final judgment entered by Your Honor. The case was referred to Your Honor by Order entered November 24, 2014 [Doc. No. 15].

**Anderson Kill P.C.**

December 11, 2014
Page 2

Riverbend loaded the copper scrap into containers and transported them to the port in Manila, for ultimate ocean transport to Rotterdam. At some point during transport of the 307 MT of copper scrap, after leaving Riverbend's warehouse and reaching the port in Manila, the copper scrap was stolen and replaced with worthless construction material and debris.

The all-risk policy Allianz sold to Metallica covers losses due to theft, trick, deceit and mysterious disappearance. *See Great Northern Insurance Co. v. Dayco Corp.*, 620 F. Supp. 346, 351 (S.D.N.Y. 1985) (holding an "insured who takes out an 'all risk' policy which does not exclude theft has a right to assume he has purchased coverage for loss by theft including theft by trick or false pretense"); *N. Am. Foreign Trading Corp. v. Mitsui Sumitomo Ins. USA, Inc.*, 499 F. Supp. 2d 361, 374 (S.D.N.Y. 2007) (holding that policyholder need not prove cause of loss and that absent a mysterious disappearance exclusion, all risk marine insurance covers mysterious disappearance among other things), *modified in part on other grounds*, 292 Fed. Appx. 73 (2d Cir. 2008). Theft is the precise cause of Plaintiff's loss here and the circumstances of the loss trigger coverage under the Allianz policy, and no relevant exclusions preclude coverage for the loss.

The loss suffered by Metallica triggers various coverage grants of the all-risk policy, including Clauses 52. and 53. because the seller of the scrap, McQan, could not pay for the loss of the cargo and because the Filipino insurance company that was to insure the cargo pursuant to the contract between McQan and Riverbend refused to cover the cargo theft. Clause 52. of the Allianz policy states, "This insurance is also specifically to cover goods purchased and paid for by the Assured on terms which do not obligate them to provide insurance, if there is a loss or damage from a peril insured herein, and the Assured cannot collect from the seller, insurance provided by the seller, or other party, because of refusal or inability to pay." Clause 53. of the Allianz policy provides coverage for, among other things, "[a]ny perils not covered by other insurance but which are covered under the terms of this Policy[]" and instances where "the Assured cannot collect under other insurance for loss and or damage by perils covered under the terms of this Policy. . . ."

Accordingly, Metallica sought coverage under its all-risk policy and timely notified Allianz of the loss. During its investigation of the insurance claim, Allianz raised the "Infidelity" exclusion at paragraph 58 as a possible grounds to deny insurance coverage. Allianz has since cited the "Infidelity" exclusion in its Answer as a complete bar to coverage. The exclusion reads: "In no case shall this insurance cover loss or damage caused by or resulting from misappropriation, secretion, conversion, infidelity or any dishonest act done by or at the instigation of the Assured or other party of interest to the underlying purchase or sale transaction, or their employees or agents (carriers for hire excepted)."

The exclusion does not apply. First, as the Allianz investigation report demonstrates (and Allianz does not purportedly contest), there was no infidelity "by or at

the instigation of the Assured", the buyer of the copper scrap. Second, there was no infidelity by McQan, the seller of the copper scrap. Third, there was no infidelity by their respective employees or agents. Riverbend was not a "party of interest" to Metallica's purchase transaction from McQan. Riverbend is not a signatory to that agreement. Riverbend had no rights and obligations under Metallica's purchase contract with McQan. There is no specific mention of Riverbend in that agreement, its agreement with McQan was not incorporated by reference into the Metallica-McQan contract, and it was not a party to that contract. See Camera Mart, Inc. v. Lumbermens Mutual Casualty Co., 58 Misc. 2d 448 (N.Y. Civ. Ct. 1968), aff'd, 1969 N.Y. Misc. LEXIS 1448 (1st Dep't 1969) (ruling against insurance company that argued application of infidelity clause that excluded from coverage, "[m]isappropriation, secretion, conversion, infidelity or any dishonest act on the part of the assured or other party of interest, his or their employees or agents or others to whom property may be entrusted (carriers for hire excepted)" because party committing theft was "not in any respect known to the prospective victim as a customer but was in fact a thief.").

Allianz' arguments attempting to broadly apply the infidelity exclusion are improper. Under controlling law, exclusions from coverage are construed narrowly, not broadly. See Cedar & Washington Assocs., LLC v. Port Auth. of N.Y. & N.J. (In re September 11 Litig.), 751 F.3d 86, 92 (2d Cir. 2014) (holding that "[t]he purpose of an all-risk insurance contract is to protect against any insurable loss not expressly excluded by the insurer or caused by the insured."); Id. (quoting Pan Am. World Airways, Inc. v. Aetna Cas. & Surety Co., 505 F.2d 989, 1003-04 (2d Cir. 1974) ("The experienced all risk insurers should have expected the exclusions drafted by them to be construed narrowly against them, and should have calculated their premiums accordingly.")); Transcap Associates, Inc. v. Cigna Ins. Co., Case No. 99-C-5292, 2001 U.S. Dist. LEXIS 26964 (N.D. Ill. Sept. 17, 2001) (construing infidelity exclusion to an inland marine insurance policy narrowly and stating that construing the exclusion broadly "would render the policy a nullity").

Allianz also denied insurance coverage arguing that the 307 MT of copper scrap never existed; instead it claimed that between "50 to 60 MT" existed. Metallica has still seen no credible evidence for the accusation that an amount less than 307 MT of copper scrap existed. Indeed, prior to this action, Metallica had repeatedly requested a copy of Allianz' investigation report that apparently formed the basis of this "50-60 MT" number, but Allianz had refused to disclose it until Allianz filed its Answer in this action. Conversely, Allianz has been provided evidence that Riverbend did indeed load and transport to the port in Manila over 300 MT of copper scrap.

Furthermore, the investigation report of Allianz confirmed that "the loading operations of total 300 t copper scrap, designed to be stuffed into 15 x 20' containers, commenced at the warehouse of Messrs. Riverbend Enterprises. . . . Three persons were attending rotationally the loading operations on behalf of buyers McQan." In contrast, the report contains statements of pure speculation that less than 300 MT of

**Anderson Kill P.C.**

December 11, 2014
Page 4

copper cargo existed (*e.g.*, "[i]t can be taken into consideration" that the 300 MT "might never have been available for shipment" and instead only "75 – 100 MT" might have been available).

McQan representatives personally witnessed the loading in the Philippines of the majority of the 15 containers shipped to the port. Photographs of the loading and transport process also were taken. Such evidence is sufficient to prove the existence of the copper scrap. *See In Re: Balfour Maclaine International Limited*, 85 F.3d 68, 76-80 (2d Cir. 1996) (holding that witness testimony and warehouse inspections, among other items, were sufficient to support finding of the existence of coffee cargo, despite challenges to the cargo's existence by the insurance company). Indeed, far less is required to prove the existence of cargo. *See Henry Heide, Inc. v. Atlantic Mut. Ins. Co.*, 80 Misc. 2d 485, 487 (Sup. Ct. N.Y. Cnty. 1975) (holding that "[t]he existence of [the sugar] cannot seriously be disputed. Plaintiff has submitted the sellers' invoices, the warehouse bills for storage which were paid, the warehouse receipts, the checks issued to pay for the purchase of the goods and the fact that it subsequently withdrew 1,200 100-pound bags of sugar on the amount in storage as evidence of the goods."). Accordingly, Allianz' denial of coverage on this basis and others argued in its Answer are without merit.

### Defendant's Description of the Case, Including the Factual and Legal Bases for the Claims Asserted

The alleged shipment of copper scrap in the approximate amount of 300 MT never existed, in whole or in part, and was never a component of a legitimate transaction between Riverbend, as supplier/seller, McQan, as buyer/seller, and MCC, as buyer, because Riverbend, a fictitious company, never intended on delivering any copper scrap to McQan but, instead, intended to defraud MCC by delivering construction materials and debris of Philippine origin and insignificant value using containers that had been manipulated to conceal a fraud. The subject policy insures against physical loss or damage, not financial loss, and, as the alleged shipment of copper scrap never existed, in whole or in part, but was part of a fraudulent scheme, MCC did not suffer physical loss or damage, but only a financial loss due to fraud.

AGCS respectfully submits that there are well established burdens of proof that must be carried in the context of a coverage dispute involving an insurance contract that insures against all-risks of only physical loss or damage subject to exclusions, warranties and other terms and conditions.

nydocs1-1042013.1

The Ocean Marine Cargo Policy No. OC-91257500 with endorsements (the "Policy") issued by AGCS provides that shipments of scrap metals "sufficiently packed to withstand the intended voyage covered by this Policy are insured against all risks of physical loss or damage from any external cause, except as noted in this policy (and excepting such risks as excluded by the Paramount Warranties in this Policy)."[2]

Financial loss is not a physical loss or damage to covered property. See *Aurubis Buffalo, Inc. v. Lumbar General Insurance Company of Canada,* No. 08-CV-00034, 2012 WL 7828965, at *3 (W.D.N.Y. Mar. 22, 2012), adopted by No. 08-CV-00034, 2013 WL 1337305 (W.D.N.Y. Mar 29, 2013); see also *Curacao Trading Co. Inc., v. Federal Insurance Co.,* 137 F.2d 911. 914 (2nd Cir. 1943) ("By plain language the policy was limited to protection against 'physical loss or damage from an external cause' and did not include protection against loss from issuance of spurious warehouse receipts. To conclude otherwise would be to change a policy of insurance to a guarantee...."). Unlike the circumstances here, in *Great Northern Insurance Co. v. Dayco Corp.,* F. Supp. 346, 351 (S.D.N.Y 1985), the insured parted "with its goods by a fraudulent scheme and false pretense." The Court concluded that the insured (*Dayco*) "physically lost the goods in that it no longer has control over them and has received no compensation for them. Its loss is not merely a credit [financial] loss. . . ." *Id.* Here, MCC never parted with any goods because the goods never existed in the first place. AGCS does not contend that "50 to 60 MT" of copper scrap existed in the sense portrayed by MCC. Rather, a small amount of copper scrap was used as part of the fraudulent scheme but was never intended to be delivered to McQan. Thus, MCC did not suffer physical loss of or damage to even this small amount of cargo because it was never intended to be delivered to McQan or MCC. MCC's loss is financial. And, unlike in *Dayco*, the Policy has two applicable fraud exclusions: the Infidelity Exclusion and the shipper's fraud exclusion.

Plaintiff must initially establish (through admissible evidence) that the copper scrap existed at the attachment of coverage and then was physically lost or damaged during the period of coverage.

Once the insured's *prima facie* case is established by its showing that it suffered a fortuitous physical loss during the period of coverage, the insurer then has the burden of putting forward evidence establishing that there was no physical loss or damage (rather, there was a financial loss) because the "loss" was due to a fraud pre-attachment of coverage and/or that an exception to coverage applies.

---

[2] The policy contains a forum selection clause (Clause 70) that requires suit to be brought in the United States District Court for the Southern District of New York and a choice of law clause (Clause 71) that calls for the application of the federal maritime law of the United States or, in the absence thereof, New York law.

**Anderson Kill P.C.**

December 11, 2014
Page 6

See e.g., *Balfour McClaine Int'l Ltd. v. Insurance Company of North America, et al.*, 85 F.3d 68, 78 (2d Cir. 1996).

Citing to *Balfour*, Plaintiff suggests that a combination of hearsay information in the form of alleged witness reports and photographs are sufficient to establish its *prima facie* case, and accordingly, the Court may move right along to the consideration of only one of the two applicable exclusions in the Policy. This is a misreading of *Balfour* and its predecessor decisions. In *Balfour*, the undersigned was the principal trial counsel. The trial Court, following a multiple-week bench trial, concluded that the insured carried its *prima facie* burden through the admission into evidence of "sworn testimony" by multiple inspectors of the goods, who confirmed their existence and other properly authenticated governmentally issued documents. Here, the alleged witnesses to the existence of the copper scrap are located overseas in South Korea, India, and the Philippines. At a pre-trial telephone conference with counsel for MCC, the undersigned inquired whether these critical witnesses would be produced for examination in the United States so as to avoid protracted and unnecessarily expensive litigation costs. Counsel for MCC demurred. Instead of an orderly discovery of the facts based on each party's respective burdens of proof, MCC proposes an "early summary judgment motion" on the Infidelity Exclusion, which it contends "can resolve Allianz's key defense as a matter of law without the need for discovery." Then, in the next sentence, MCC states, "[o]nce the Court rules on the MPSJ, either the parties can proceed with discovery to determine the quantity of copper scrap", or an appeal can proceed.

MCC's proposal will not resolve the coverage question because (1) there are questions of fact that will preclude summary judgment as a matter of law on the Infidelity Exclusion; (2) MCC entirely ignores the second exclusion in the Policy (the Fraudulent Bill of Lading clause); and (3) MCC must in any event carry its *prima facie* burden through the overseas depositions and other admissible evidence discussed above and AGCS will then have the burden to show that there was no physical loss or damage.

The purchase and sales agreement between MCC and McQan and the sales contract between McQan and Riverbend were on back-to-back terms and were part of a single transaction by which Riverbend was allegedly to supply the copper scrap that was allegedly to be sold to MCC by McQan. The bill of lading allegedly issued by Gateway Container Line Phils. Inc. identifies "RIVERBEND ENTERPRISES" as the shipper of the copper scrap allegedly sold to MCC by McQan.

Riverbend is a fictitious company, the business addresses and the warehouse address provided by Riverbend are fictitious and the warehouse where the containers had been loaded was later found to be vacant with no sign of Riverbend. The company appointed by Riverbend to confirm the existence of the copper scrap in the approximate amount of 300MT is also a fictitious company, and the warehouse

**Anderson Kill P.C.**

December 11, 2014
Page 7

address mentioned in the company's report is not actually a warehouse.

Riverbend allegedly supplied the fifteen containers for the alleged shipment of copper scrap. The doors of the fifteen containers had been patently manipulated so that the sealed doors could be opened after loading in such a way that the seal was not broken and without any other indication that the sealed containers had been opened, thus allowing the contents of each container to be surreptitiously removed after the doors had been sealed. Riverbend was allegedly responsible for the loading of the fifteen containers at its warehouse and for delivering the loaded containers to the terminal at the load port. Only one container was loaded at a time, and the containers were delivered to the terminal separately. The copper scrap was allegedly brought to Riverbend's warehouse by pickup trucks immediately prior to being loaded into each container. Each of the fifteen containers, after allegedly having been seen to be loaded with copper scrap and allegedly having been seen to be sealed, was not delivered to the terminal for many hours after departing the warehouse.

The time between each container's departure from the warehouse and each container's delivery to the terminal was sufficient to allow the container to be surreptitiously unloaded and surreptitiously reloaded with the construction materials and debris. As part of a fraudulent scheme, the copper scrap allegedly seen to be loaded into each container was removed and replaced by the construction materials and debris in the period between each container's departure from the warehouse and each container's delivery to the terminal many hours later. The copper scrap that was allegedly seen to be loaded into the first few containers was returned to the warehouse and re-used in the following containers again and again to make it appear as though the entire shipment of approximately 300MT existed.

Gateway, a non-vessel owning common carrier (NVOCC), was allegedly engaged to transport the alleged shipment of copper scrap from the Philippines to Europe. Gateway, in turn, allegedly engaged Mitsui O.S.K. Lines, Ltd. to perform the ocean carriage of the alleged shipment of copper scrap from the Philippines to Europe. Gateway allegedly prepared and issued a bill of lading at Manila, Philippines dated November 4, 2013 based on the instructions provided by MCC through McQan. The bill of lading allegedly issued by Gateway identifies "RIVERBEND ENTERPRISES" as the shipper. MCC allegedly paid 75% of the purchase price under the Purchase Agreement to McQan on or about November 14, 2013 based on the copy of the endorsed Gateway bill of lading that it allegedly received on or about November 9, 2014. The bill of lading allegedly issued by Gateway is a fraudulent bill of lading because the fifteen containers did not contain the copper wire scrap described on the bill of lading but, instead, contained construction materials and debris. Riverbend, the shipper, was party to the fraudulent scheme that resulted in the claimed loss of the alleged shipment of copper scrap.

AGCS' investigator ultimately concluded that "[n]o evidence has been provided to us by documents until the typing of this report proving that the total quantity of 307.03 tons of copper scrap has ever existed during the loading operations in Manila in October 2013." Reck & Co. Report dated 5/8/2014 at p. 27.

> In the opinion of the surveyor and proven by the photos provided, all 15 containers had been manipulated prior to loading. It can be assumed that all containers had been manipulated on behalf of sellers Riverbend Enterprises as an active part of this fraud. Various bolts and nuts on all 15 right container doors had been exchanged by design for a re-opening of container doors and a re-stuffing of the cargoes without causing any damage to the attached HSS seals.

Riverbend was a "party of interest to the underlying purchase or sale transaction" within the meaning of the Infidelity Exclusion. Riverbend was party to the fraudulent scheme that resulted in the claimed loss of the alleged shipment of copper scrap. The claimed loss of the alleged shipment of copper scrap was caused by or resulted from misappropriation, conversion, infidelity or a dishonest act done by or at the instigation of Riverbend. The case of *Camera Mart, Inc. v. Lumbermens Mutual Casualty Co.,* 58 Misc. 2d 448 (N.Y. Civ. Ct. 1968), *aff'd*, 1969 N.Y. Misc. LEXIS 1448 (1st Dep't 1969) does not address the same infidelity exclusion in the Policy. In *Camera Mart*, the court interpreted the language "others to whom property may be entrusted" to mean "persons whose status is created or accepted by the assured, the result of a consensual relationship between the parties . . . ." *Id.* at 452.

Clause 53 in the Policy is not applicable because the pre-condition for its trigger is that the goods must be "covered by other insurance." MCC admits that no other insurance was procured for the alleged shipment. In fact, the insurer Charter Ping An has taken the position that the insurance for the alleged shipment in its name is fraudulent.

Clause 52 in the Policy is also not applicable because physical loss or damage is required to trigger that provision. Assuming, *arguendo*, Clause 52 of the Policy were triggered and MCC were entitled to coverage under the Policy for the claimed loss, it forfeits such coverage to the extent it fails to preserve its rights against McQan, any insurance provided by McQan or other parties (including, but not limited to, the NVOCC and the ocean carrier).

Finally, MCC alleges that it is entitled to coverage under the Policy "in an amount no less than $2,325,766.75." However, MCC alleges that it only paid a total of $1,813,950.12 to McQan under the Purchase Agreement. Assuming, *arguendo*, Clause 52 of the Policy were triggered and MCC were entitled to coverage under the Policy for

Case 1:14-cv-08302-JCF   Document 16   Filed 12/11/14   Page 9 of 10

**Anderson Kill P.C.**

December 11, 2014
Page 9

the claimed loss, the coverage is triggered only to the extent MCC paid for the goods and the valuation provision in Clause 52 controls.

## Plaintiff's Contemplated Motions

Subject to the Court's approval, Plaintiff wishes to file an early motion for partial summary judgment with respect to Allianz's seventh affirmative defense (the infidelity clause exclusion) by January 27, 2014 (the "MPSJ"). Allianz's opposition to the MPSJ would be due by February 27, 2014. Plaintiff's reply in further support of the MPSJ would be due by March 11, 2014. Plaintiff believes this early summary judgment motion can resolve Allianz' key defense as a matter of law without the need for discovery. Once the Court rules on the MPSJ, either the parties can proceed with discovery to determine the quantity of copper scrap at issue in this case or an appeal of the Court's decision can be undertaken if appropriate, without the parties having expended substantial resources on discovery that may prove unnecessary. Plaintiff does not believe that the other arguments or exclusions Allianz raises in its Answer warrant substantial consideration by Your Honor.

## Defendant's Proposed Discovery Schedule and Contemplated Motions

AGCS believes an orderly case management order that allows for discovery and then motions will best address this case efficiently. We are prepared at the direction of Your Honor to submit a proposed schedule to the Court.

The length of discovery will be determined by the number of overseas depositions to be conducted. In particular, the alleged witnesses to the existence of the cargo are allegedly located in South Korea, India and the Philippines. The documents for the terminal in the Philippines will also need to be secured. The balance of the party and non-party witnesses are located in the United States.

At the conclusion of fact discovery, we propose the parties may file motions for summary judgment.

**Anderson Kill P.C.**

December 11, 2014
Page 10

### Prospect for Settlement

At this time, the parties are far apart on the amount needed to settle this dispute and two prior settlement meetings have been unsuccessful. However, the parties have agreed to consider future settlement discussions.

Respectfully submitted,

_____
Joshua Gold, Esq.
Dennis J. Nolan, Esq.
Bruce E. Strong, Esq.
ANDERSON KILL, P.C.
1251 Avenue of the Americas
New York, New York 10020

*Attorneys for Plaintiff*

_____
John A.V. Nicoletti, Esq.
Nooshin Namazi, Esq.
Kevin John Byron O'Malley, Esq.
Nicoletti Hornig & Sweeney
88 Pine Street, 7th Floor
New York, NY 10005
*Attorneys for Defendant*