# EXHIBIT F

Case 1:14-cv-08302-JCF   Document 20-6   Filed 01/26/15   Page 1 of 8



Allianz Global Corporate & Specialty®

May 14, 2014

Paul J. Fitzpatrick, Esq.
Executive Vice President
Nausch, Hogan & Murray, Inc.
180 Maiden Lane
New York, New York 10038

      Re:    M/V Resourceful, Voy. 402W
              M/V APL Raffles, Voy. 003W46
              15 X 20' Containers said to contain
              307.03 tons Copper Wire Scrap.
              D.O.L.: 11/4/13
              NHM Ref. 13/1778
              AGCS Claim No. 20084334
              Policy #: OC-91257500
              Insurer: AGCS Marine Insurance Company

Dear Mr. Fitzpatrick:

      In an email dated May 6, 2014 you have asked us for a "concrete position" with respect to coverage, even though our investigation into the underlying facts surrounding this fraud is continuing under a reservation of rights as we made clear to you in our letter of March 6, 2014.

      Nevertheless, we fully understand the reason for your request and we appreciate the cooperation and assistance that has been received from the assured and your office. Regrettably however, based upon the facts unearthed to date, we do not see how the apparent financial losses suffered by Metallica affiliate MCC Non Ferrous Trading Inc. and its financing party VMF Special Purpose Vehicle SPC c/o Vermillion Asset Management LLC, will be covered under Ocean Marine Cargo Policy OC91257500.

      Inasmuch as this was a CIF shipment, the claim was reported under the Contingent Coverage for Assured as Consignee section of the policy (Clause 52) because as you know, the policy by virtue of Clause 6 does not attach to "goods purchased by the Assured on C.I.F. or other terms including insurance." Clause 52 provides in pertinent part that:

"52.    This insurance is also specifically to cover goods purchased and paid for by the Assured on terms which do not obligate them to provide insurance, if there is loss or damage from a peril insured herein, and the Assured cannot collect from the Seller, insurance provided by the Seller, or other party, because of refusal or inability to pay."

      Although we continue to investigate this aspect of the matter in the Philippines, the insurance provided by "the seller or other party" (Riverbend Enterprises) with Filipino insurer Charter Ping An is said to be "counterfeit" by attorneys claiming to represent them. This

Thomas W. Curran, Claims Manager—Ocean Cargo
Allianz Global Corporate & Specialty
One Chase Manhattan Plaza, 37th floor
New York, NY 10005
Tel. 1.646.472.1425 Fax. 1.212.524 6805
Email: Thomas.Curran@agcs.allianz.com

Page 2 of 7
Claim 20084334
5/14/2014

information was provided by McQan Corporation, who also would seem to be responsible to Metallica for its financial loss. No information has been furnished with respect to the Assured's efforts to recover from McQan or other responsible parties. Has there been a refusal to pay?

Notwithstanding these open issues, we shall assume for the purposes of this discussion that our contingent coverage is applicable.

It seems to be common ground that this shipment was the result of a large scale fraud perpetuated by the underlying seller/supplier Riverbend Enterprises. According to documents given to our investigator by the assured, Metallica personnel were very much aware of the risks associated with scams involving copper shipped from the Philippines. In light of this knowledge, Metallica wanted its own representative present during the loading of the containers. However, due to the apparent unavailability of a qualified surveyor, Metallica relied upon the reports and advices of employees and agents of its trading partner McQan Corporation as well as those of the underlying seller/supplier Riverbend.

The salient facts are, as we understand them, as follows:

1. On September 30, 2013 McQan Corporation, a South Korean trading company entered into a contract with Riverbend Enterprises in Quezon City, Philippines to supply a trial lot approximately 300 MT of Copper Millberry Scrap "Followed by 300-500 MTs per month upon completion of the trial load." McQan had never dealt with Riverbend before, and had been introduced to them by Anthony Kim, a U.S. (Georgia) based agent with whom they had been doing business for approximately 2 years.

2. The Riverbend Sales Contract No. MQ0723 called for sale on a CIF Hamburg basis, loading at Manila, Philippines. Payment terms called for a 10% downpayment (referred to as a "Performance Bond" or "PB") within 5 banking days of signing the contract and upon verification of the weight and assay from "Independent International Surveyor Preferred by the Buyer and Paid for the Seller." An additional 75% "DP Payment" or payment against documents was to be made within 7 days of presentation of a full set of documents including bill of lading, invoice and insurance certificate for 110% of the CIF value. Title and risk of loss were to pass to the buyer upon the receipt of the DP Payment. The actual price was to be determined by reference to the average price on the LME (London Metal Exchange) for the two week period following the bill of lading date with a final payment due within 3 days of issuance of an inspection certificate certifying weights and analysis at destination.

The Riverbend Contract also provided for arbitration of all disputes in New York with New York law governing the proceedings.

It also provided that "Insurance shall be issued by a first class insurance company at Seller's expense for 110% of the provisional value covering all risks as per Institute Cargo Clause including War and Institute Strike Riot and Civil Commotion Clauses payable to the Buyer in USD."

Thomas W. Curran, Claims Manager—Ocean Cargo
Allianz Global Corporate & Specialty
One Chase Manhattan Plaza, 37th floor
New York, NY 10005
Tel. 1.646.472.1425 Fax. 1.212.524 6805
Email: Thomas.Curran@agcs.allianz.com

Page 3 of 7
Claim 20084334
5/14/2014

    3.    At or about the same time, the assured (Metallica affiliate MCC Non Ferrous Trading Inc.) entered into Purchase Agreement No. M1313-P with McQan Corporation. It too called for the shipment of approximately 300 MT of Copper Wire Scrap on a CIF "Hamburg, Brimahaven or Parity" basis as a "trial lot followed by 300-500 MT per month". It too required a 10% "Performance Bond" as a downpayment, and called for a "DP" or payment against documents of 75% with the final 15% due at destination.

    Similarly, this McQan contract with the assured MCC contains virtually identical "Weighing and Sampling", "Force Majeure", "Definitions", "Suspension of Quotations", "Notices", "Succession", "Law and Jurisdiction", "Insurance" and "Waiver" provisions to those found in the underlying Riverbend contract. It also provides that "Buyer" [presumably MCC] has "the right to be represented at final loading and sealing of containers and to receive a legally binding contract from the Supplier and Seller [presumably Riverbend]."

    4.    Assuming that the Buyer referred to above was MCC, it apparently delegated its right to be present during the loading of the containers to a young member of McQan's staff named Seong Geun Lee as well as Anthony Kim, McQan's U.S. Based agent.

    5.    As a result of late arrival in the Philippines, Messrs Lee and Kim did not witness the loading of the first four of the fifteen containers shipped. Loading of these containers purportedly was witnessed by a Vikash Thacker who was described to be a representative of the underlying seller Riverbend. He worked in the company of someone who identified himself as Willy Uy, also a Riverbend representative, who was in overall charge of the loading operation. According to our investigator, the photograph of Willy Uy provided by Anthony Kim bears a very strong resemblance to photos of the perpetrator of previous copper scrap frauds.

    6.    Mr. Lee and Mr. Kim say that one or both of them were present during the loading of the 11 remaining containers. However, the loading did not take place at the location Riverbend had provided in all of the prior documentation. That address, 1985 A. Bonifacio Avenue, Cainta, Rizal, Philippines is reported by our investigator to be a residential area with no warehouses and no number reaching 1985.

    7.    Neither Mr. Lee nor Mr. Kim could provide the address where the actual loading is alleged to have occurred. Anthony Kim said that he could get there again by giving a cab driver the name of a popular shopping mall which it was near.

    8.    Both gentlemen said that they never saw the entire 300 MT consignment of copper at the warehouse where the loading took place and that the 50-60 MT that they did see at any one time had been brought in by pickup trucks just prior to loading.

    9.    After showing the photographs of the warehouse in the loading photographs taken by Messrs. Lee and Kim to a colleague in London who has investigated many previous Manila copper scams, the neighborhood was identified. And, when our investigator sent a "Google Earth" screen shot to Anthony Kim he was able to opine that the warehouse was somewhere southeast of the St. Lucia East Grand Mall.

Thomas W. Curran, Claims Manager —Ocean Cargo
Allianz Global Corporate & Specialty
One Chase Manhattan Plaza, 37th floor
New York, NY 10005
Tel. 1.646.472.1425 Fax. 1.212.524.6805
Email: Thomas.Curran@agcs.allianz.com

Page 4 of 7
Claim 20084334
5/14/2014

10. As you know, when the containers arrived at destination they were found not to contain copper scrap, but rather bricks, blocks and other construction debris. Our investigator has determined that these materials were of Philippine origin.

11. Examination of the containers showed that their doors and latching mechanisms all had been modified in such a manner as to allow the latches to easily be unbolted from the outside using a 17 mm socket wrench, allowing opening and reclosing without disturbing the seals. These modifications would have been evident to any experienced cargo surveyor. In fact, the photos taken at loading by the Seller's representatives and Messrs Lee and Kim clearly show that these modifications had been made prior to loading.

12. Messrs. Lee and Kim said that after each container was loaded and connected to a tractor provided by Riverbend, one of them would follow it to the "port gate" by car where they observed the seals being affixed to the modified door hardware.

13. No interchange receipts have been provided to document when and to whom these alleged deliveries to the port gate occurred, nor were any given to Messrs. Lee and Kim. Moreover, the photographs provided show that the "port gate" involved was not the entrance to the terminal. It was in fact, a side exit from one of the port's access roads. The actual terminal gate through which export shipments must pass before being accepted by the terminal is blocks away and is a multi-line plaza with attendant security and documentation facilities.

14. By comparing the beginning of each container's stuffing times as furnished and compiled by the Riverbend and later the McQan agents, with the official tracking data available on the ocean carrier Mitsui O.S.K. Lines ("M.O.L.") website, showing the exact date and time that the containers were picked up from M.O.L. by the shippers, periods of time ranging between 5 and 85 hours are unaccounted for. This allowed ample time for Riverbend and its accomplices to make the modifications to the container latching mechanisms on each container prior to their appearing for loading.

15. Further, by comparing the dates and times reported by Riverbend/McQan for purported "delivery" to the port side gate, with the actual "In Gate" times recorded on the M.O.L website, our investigator has determined that there were elapsed time gaps of between 6.3 and 52 hours for all of the containers.

16. Thus, our investigator believes that once each loaded container arrived at the side gate to the port, after the seals were affixed and the witnesses departed, the Riverbend truck turned around, proceeded to another warehouse where the copper scrap was unloaded and replaced with the construction debris, all without disturbing the seals. Thereafter, the container was actually delivered through the proper gate to M.O.L. for eventual loading on board the M/V Resourceful . . . with the copper scrap then available for "recycling" back through the same procedure to be used in loading the next container. Our investigator estimates that no more than 50-60 MT of actual copper scrap would have been necessary to go through this process for the 15 involved containers.

17. Based upon the Bill of Lading drafted by the assured for presentation to Riverbend and eventually issued by the NVOCC, Gateway Container Line, the cargo was described as "15

Thomas W. Curran, Claims Manager –Ocean Cargo
Allianz Global Corporate & Specialty
One Chase Manhattan Plaza, 37th floor
New York, NY 10005
Tel. 1.646.472.1425 Fax. 1.212.524 6805
Email: Thomas.Curran@agcs.allianz.com

Page 5 of 7
Claim 20084334
5/14/2014

20' containers, Shipper's Load and Count and Sealed said to contain 307.50 MT copper wire scrap as per [Riverbend] Contract No. MQ0723 dated September 30, 2013." At the assured's instruction, this "to order" bill of lading was endorsed by Riverbend to MCC's financing partner "VMF Special Purpose Vehicle SPC on behalf of M1 Segregated Portfolio c/o Vermillion Asset Management.

18. The master bill of lading issued by the ocean carrier Mitsui O.S.K. Lines, Ltd. describes the cargo the same way as having been laden on board the vessel "Resourceful" at Manila on 5 November 2013. Yet, for reasons which still remain unknown at this time, MOL's freight bill states that the commodity being shipped was "Construction Materials".

19. As previously indicated, we are told that the insurance policy provided by Riverbend, purportedly issued by Charter Ping An is not genuine . . . although Charter Ping An have yet to respond to our inquiries as to the status of the claim presumably made by McQan.

20. Additionally, despite our efforts in the Philippines there is no trace of Riverbend Enterprises at any of the addresses provided in the documents or anyplace else for that matter.

## COVERAGE ANALYSIS

According to the underlying contracts as well as the applicable INCOTERMS, as a CIF Seller, title and risk of loss did not pass from Riverbend Enterprises until the cargo passed the ship's rail. According to all available information, the 307.5 MT cargo of copper scrap noted on the bill of lading did not actually exist at that time, due to the fraud of the shipper, Riverbend.

Therefore, MCC Trading's financial loss by virtue of having advanced money against the on board bill of lading would not be covered under the policy's all risk of physical loss or damage wording.

We note that at Paragraph 49 entitled Fraudulent Bills of Lading the policy says:

"49. This Policy covers physical loss or damage occasioned through the acceptance by the Assured or their agents or shippers of fraudulent Bills of Lading and/or shipping receipts and/or messenger receipts, or by the use of legitimate bills of lading and/or other shipping documents without the authorization of the Assured or their agents, all provided that:

A. the coverage for the shipment includes loss caused by theft; AND

B. in no event does this Policy cover loss or damage arising from the shipper's fraud or misstatement."

We find no coverage for MCC's financial loss under this provision because of the fact that the copper was not physically lost and that by all accounts, the financial loss was due to the shipper's fraud and misstatement.

Clause 47 is entitled "Unexplained Shortage" and reads as follows:

Thomas W. Curran, Claims Manager –Ocean Cargo
Allianz Global Corporate & Specialty
One Chase Manhattan Plaza, 37th floor
New York, NY 10005
Tel. 1.646.472.1425 Fax. 1.212.524 6805
Email: Thomas.Curran@agcs.allianz.com

Page 6 of 7
Claim 20084334
5/14/2014

"47.   This insurance is also specifically to cover shortage of goods insured from intermodal container(s), meaning (a) the difference between the number of packages as per shippers and/or suppliers invoice and/or packing list which were loaded and (b) the count of the packages removed taken by the Assured and/or their agent at the time of discharge from the container upon arrival at the final insured destination, provided that:

    A.   the coverage for the shipment includes loss caused by theft: AND

    B.   the Assured makes every attempt to recover the loss from anyone who may have been responsible for the shortage through involvement in stuffing the container; AND

    C.   this clause excludes liability for any such loss which can be attributed to forcible entry into the container which occurred after its delivery to the store, warehouse, factory or other premises to which the goods are insured.

It is a condition precedent to this coverage that the Assured shall not divulge the existence of this coverage to any party. Such disclosure shall void coverage provided by this clause."

Inasmuch as this is not a claim for a shortage in the number of packages received, there is no coverage for the financial loss here either.

Lastly, as we indicated in our letter of March 6, 2014, Paramount Warranty No. 58, which applies to all sections of the policy, reads as follows:

"58.   In no case shall this insurance cover loss or damage caused by or resulting from misappropriation, secretion, conversion, infidelity or any dishonest act done by or at the instigation of the Assured or other party of interest to the underlying purchase or sale transaction, or their employees or agents (carriers for hire excepted)."

Even if there had been a physical loss of the cargo during the period of the coverage, the fraudulent scheme of the underlying supplier/seller Riverbend and its agents clearly amounted to a dishonest act done by "another party of interest to the underlying purchase or sale transaction." In recent correspondence you have intimated that because MCC had a contract with McQan, Riverbend was not a party of interest to the underlying transaction. We respectfully disagree.

Clearly, based upon the contract documentation provided as well as the correspondence, the underlying seller and supplier in the back to back CIF trades was Riverbend. The Riverbend contract No. MQ0723 (specifically identified on its face) was the transaction which led to the issuance of the bill of lading. And it was Riverbend, who at MCC's instruction endorsed the bill of lading directly to MCC's financing partner VMF Special Purpose Vehicle SPC which was the predicate for the payment MCC made.

As stated earlier, we think it highly unlikely that our continuing investigation will establish any facts which will change the coverage position we have taken but should any such facts emerge we will let you know. In the meantime, if you believe that there are other facts that we should consider, please let us know.

Thomas W. Curran, Claims Manager – Ocean Cargo
Allianz Global Corporate & Specialty
One Chase Manhattan Plaza, 37th floor
New York, NY 10005
Tel. 1.646.472.1425 Fax. 1.212.524 6805
Email: Thomas.Curran@agcs.allianz.com

Page 7 of 7
Claim 20084334
5/14/2014

    Under the circumstances, as the matter now stands, we are willing to consider reimbursing the assured for any demurrage charges incurred as a result of our investigation. In this respect, please provide us with the charges and if paid, proof of payment.

    We continue to reserve all of our rights and defenses under the policy whether stated specifically herein or not, at law or otherwise and look forward to discussing this with you and/or the assured further if you have any questions.

Sincerely,

Thomas Curran,
Claims Manager-Ocean Cargo

Thomas W. Curran, Claims Manager--Ocean Cargo
Allianz Global Corporate & Specialty
One Chase Manhattan Plaza, 37th floor
New York, NY 10005
Tel. 1.646.472.1425 Fax. 1.212.524.6805
Email: Thomas.Curran@agcs.allianz.com