UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MCC NON FERROUS TRADING INC.,

                Plaintiff,

        - against –

AGCS MARINE INSURANCE COMPANY,

                Defendant.

Civil No. 14-CV-8302 (JCF)

---

**LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
ON ALLIANZ' DEFENSES REGARDING THEFT WITH FRAUDULENT INTENT AND
THE "INFIDELITY" EXCLUSION**

---

1

Pursuant to Rule 56.1(a) of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, Plaintiff, MCC Non Ferrous Trading, Inc. ("Metallica" or "Plaintiff") sets forth the following statement of undisputed material facts in support of its Motion for Summary Judgment on Defendant AGCS Marine Insurance Company's ("Allianz'") defenses regarding: (1) Theft with Fraudulent Intent; and (2) the "Infidelity" exclusion in accordance with this Court's Order dated December 19, 2014 (Doc. 17).

1.     Metallica has been involved in trading non-ferrous metals and specializes in the commercial recycling of residues and byproducts generated by the mining and metallurgical industries.  See Affidavit of Brian Kim, dated January 26, 2015, filed together with the Motion (the "Kim Affidavit") at ¶ 2.

2.     As part of Metallica's normal course of business, it purchases copper scrap and re-sells the same material to another buyer or user.  Metallica typically does this by entering into separate transactions with both sellers and buyers of metals, including scrap metals like copper scrap.  See Kim Affidavit at ¶ 3.

3.     Allianz sold to Metallica an "open" all-risk "Ocean Marine Cargo Policy," No. OC91257500 (the "Insurance Policy"), which stated that "This insurance shall attach on shipments made on and after January 16, 2013.  See Exhibit A to the Declaration of Joshua Gold, dated January 26, 2015, filed together with the Motion (the "Gold Declaration").

4.     In October 2013, Metallica entered into a contract, dated October 16, 2013 (the "McQan-Metallica Contract"), with a South Korean company to purchase copper

2

scrap from the Philippines that was being sold by an entity named McQan Corporation ("McQan").  See Kim Affidavit at ¶ 4, Exhibit A.

 5. McQan's principal, J.Y. Lee, was a gentleman with whom Metallica had worked with before on several occasions without incident and continues to do so.  See Kim Affidavit at ¶ 4.

 6. The McQan-Metallica Contract obligated McQan to, among other things, sell to Metallica "Copper wire scrap as per ISRI Berry" in an approximate amount of 300 MT.  See Kim Affidavit at ¶ 4.

 7. Prior to entering into the McQan-Metallica Contract, Metallica asked for confirmation, which was received, of the existence of the copper scrap to be purchased from McQan in an amount over 300 MT.  See Kim Affidavit at ¶ 5.

 8. McQan provided Metallica with photographs of the copper scrap that Mr. Lee personally inspected in the Philippines prior to October 16, 2013.  See Kim Affidavit at ¶ 6.

 9. Upon receiving confirmation from McQan that it would be able to sell 300 MT or more in copper scrap to Metallica, Metallica's CEO, Mr. Glendon Archer, signed the McQan-Metallica Contract on October 13, 2013.  See Kim Affidavit at ¶ 7.

 10. McQan signed the McQan-Metallica Contract on or about October 17, 2013. See Kim Affidavit at ¶ 8.

 11. McQan had previously purchased the copper scrap from a registered Filipino entity called Riverbend Enterprises, in a contract dated September 30, 2013. Kim Affidavit at ¶ 9.

12.     At the time that Metallica entered into the purchase transaction with McQan, it had never heard of Riverbend Enterprises and had no dealing with Riverbend Enterprises.  It was not until November 2013 that Metallica had ever heard of such an entity or that it was the entity that had previously sold copper scrap to McQan.  Kim Affidavit at ¶ 9.

13.     Metallica arranged to sell the cargo scrap purchased from McQan to a large European copper smelter, Aurubis AG Recycling ("Aurubis"), pursuant to a contract executed on October 16, 2013, between Metallica and Aurubis.  See Kim Affidavit at ¶ 10, Exhibit C.

14.     During the last week of October 2013 through the beginning of November, the loading of the copper scrap took place at a warehouse located in the metropolitan area of Manila in the Philippines.  See Gold Declaration at ¶3, Exhibit B at 146-147. [1]

15.     McQan employees and representatives, including a gentleman named Anthony Kim, a resident of Atlanta, Georgia, personally witnessed the actual loading of the copper scrap into eleven of the fifteen containers and took photographs of the loading and transportation process, en route to the terminal at the Port of Manila.  See Gold Declaration at ¶3, Exhibit B at 140-141.

16.     The loading and transport of the first four containers with the copper scrap were personally witnessed by an individual named Vikash Thacker—a logistics consultant and resident of India.  See Gold Declaration at ¶3, Exhibit B at 4 and 132.

---

[1]     While Metallica disputes numerous conclusions in the Allianz report, statements against Allianz' interests contained therein are admissible as admissions under Rule 802(d)(2)(D) of the Federal Rules of Evidence.

17.     Mr. Thacker took photographs of the loading process and transport process.  See Gold Declaration at ¶3, Exhibit B at 135.

18.     During the loading process, eyewitnesses inspected and photographed the copper scrap loaded into the cargo containers.  See Gold Declaration at ¶3, Exhibit B at 140.

19.     After each container was fully loaded with its respective share of the copper scrap, the containers were locked and driven to an area just outside the port terminal entrance.  See Gold Declaration at ¶3, Exhibit B at 5.

20.     After verifying that the containers were still carrying the copper scrap load, the containers were sealed and driven through a security entrance at the port of Manila for ultimate ocean transit to Rotterdam.  See Gold Declaration at ¶3, Exhibit B at 4-5.

21.     The cargo containers were then loaded onto a container ship, which left Manila on November 5, 2013.  See Gold Declaration at ¶3, Exhibit B at 200.  The vessel delivering the copper scrap containers arrived in Rotterdam on December 16, 2013. See Gold Declaration at ¶3, Exhibit B at 1.

22.     Upon arrival of the vessel delivering the copper scrap containers to Rotterdam, five containers were delivered to Aurubis.  See Gold Declaration at ¶3, Exhibit B at 136.  Aurubis representatives and Metallica's surveyor opened the five cargo containers and recognized that the copper scrap had been removed and replaced with construction materials and debris.  See Gold Declaration at ¶3, Exhibit B at 136.

23.     The remaining ten cargo containers were then moved from the Rotterdam port to a warehouse in which they were inspected by Metallica's surveyor with Allianz' investigator.  See Gold Declaration at ¶3, Exhibit B at 137.

24.    The copper scrap in these containers similarly had been removed and replaced with construction materials and debris.  See Gold Declaration at ¶3, Exhibit B at 157.

25.    Aurubis refused the shipment of cargo as delivered.  See Kim Affidavit at ¶ 11.

26.    The copper scrap cargo had been stolen during transit after it had been delivered to the Port of Manila.  See Gold Declaration at ¶3, Exhibit B at 157.

27.    The containers' copper scrap cargo was replaced with worthless construction materials and debris. See Gold Declaration at ¶3, Exhibit B at 157.

28.    On December 18, 2013, Metallica notified McQan of the cargo theft.  See Kim Affidavit at ¶ 12, Exhibit D.

29.    McQan, in turn, tried to contact Riverbend Enterprises, the entity that had sold McQan the copper scrap, but was unable to do so.  See Gold Declaration at ¶3, Exhibit B at 142.

30.    McQan both alerted the police department in the Philippines and also filed an insurance claim with the insurance company that purportedly had agreed to insure McQan's purchase and shipment of copper scrap, Charter Ping An.  See Gold Declaration at ¶3, Exhibit B at 7, 139 and 152.

31.    Charter Ping An, refused to pay the claim.  See Gold Declaration at ¶3, Exhibit B at 152.

32.    On or about December 20, 2013, Allianz was provided notice of the cargo theft.  See Kim Affidavit at ¶ 13, Exhibit E.

33.     In May 2014, Allianz denied insurance coverage for Metallica's claim for the theft of copper scrap cargo.  <u>See</u> Kim Affidavit at ¶¶ 15-16, Exhibit F.

34.     Allianz agreed to insure all shipments "by or to" Metallica or for "their account", including "Scrap Metals."  Scrap metals are expressly covered "[a]gainst all risk of physical loss or damage from any external cause. . . ."  <u>See</u> Gold Declaration at ¶2, Exhibit A at ¶ 6 & Declaration Page.

35.     The "Interest" clause at paragraph 6 provides:

> This Policy is to cover all shipments by or to the Assured for their account as Principals or as Agents for others, or for account of others with orders to insure, provided such orders are given in writing prior to the attachment of risk hereunder and prior to any known loss or damage; excluding, unless otherwise provided herein, goods sold under instructions not to insure and goods purchased by the Assured on C.I.F. or on other terms including insurance.

<u>See</u> Gold Declaration at ¶2, Exhibit A at ¶ 6.

36.     The "Insurable Interest Admitted" clause at paragraph 73 provides:

> Notwithstanding the terms of sale or terms of purchase and provided that the named Assured is responsible for insuring the overseas voyage and that such shipment is insured by this Policy, the interest of the named Assured shall at all time be admitted during the entire transit as outlined in the Warehouse to Warehouse and Marine Extension Clause contained in this Policy. In the event a claim arises which would be covered under this clause, the Assured agrees to use all reasonable means to first recover the full amount of loss from the buyer or seller, or their insurers, in accordance with the terms of sale or purchase. In the event of payment of claim by this Company under this clause, the Assured agrees to subrogate to this Company all rights of recovery against the buyer or seller, or their insurers, or other responsible party and to provide all reasonable assistance to this Company in pursuing said rights.

<u>See</u> Gold Declaration at ¶2, Exhibit A at ¶ 73.

37.     The copper scrap shipment in question comprises a "shipment[] by or to the Assured for their account."  <u>See</u> Gold Declaration at ¶2, Exhibit A at ¶ 6.

7

38.     The Insurance Policy limits coverage for the purchase of goods "by the Assured on C.I.F. or other terms including insurance" unless "otherwise provided herein."  See Gold Declaration at ¶2, Exhibit A at ¶ 6.

39.     Paragraphs 52 (Contingency Insurance for Assured as Consignee) and 53 (Difference in Conditions/Increased Value/Guarantee of Collectability) of the Insurance Policy provide insurance coverage to Metallica as a purchaser in instances where the seller is charged in the first instance with arranging for cargo insurance.  See Gold Declaration at ¶2, Exhibit A at ¶¶ 52, 53.

40.     Clause 52 of the Allianz policy states:

> This insurance is also specifically to cover goods purchased and paid for by the Assured on terms which do not obligate them to provide insurance, if there is a loss or damage from a peril insured herein, and the Assured cannot collect from the seller, insurance provided by the seller, or other party, because of refusal or inability to pay.

See Gold Declaration at ¶2, Exhibit A at ¶ 52.

41.     Clause 53 of the Allianz policy provides coverage for, among other things, "[a]ny perils not covered by other insurance but which are covered under the terms of this Policy[]" and instances where "the Assured cannot collect under other insurance for loss and or damage by perils covered under the terms of this Policy. . . ."  See Gold Declaration at ¶2, Exhibit A at ¶ 53.

42.     In denying insurance coverage, Allianz argued that there was not 307 MT of copper scrap.  See Kim Affidavit at ¶ 16-17, Exhibit F at 4.

43.     Allianz argued that fewer than 307 MT of copper scrap existed because the thief of the copper allegedly "recycled" the copper scrap from previously loaded cargo containers to others.  See Kim Affidavit at ¶ 17, Exhibit F at 4-5.

8

44.     Allianz received in the course of its claim investigation, among other things, photographic evidence of 15 separate cargo containers being loaded with copper scrap.  See Gold Declaration at ¶3, Exhibit B at 140.

45.     In the course of its investigation of the claim, Allianz retained Reck & Co. and G4S to investigate the cargo theft.  See Gold Declaration at ¶3, Exhibit B.

46.     Reck & Co. and G4S prepared a report of their claim investigation for cargo theft which was provided to Allianz.  See Gold Declaration at ¶3, Exhibit B.

47.     Allianz had refused to disclose this report to Metallica until it answered the Complaint on November 10, 2014, at which time Allianz' counsel made a portion of the investigator's report available.  See Kim Affidavit at ¶¶ 18 and 19.

48.     Allianz admits in the report that a theft took place and confirms that "the loading operations of total 300 t copper scrap, designed to be stuffed into 15 x 20' containers, commenced at the warehouse of Messrs. Riverbend Enterprises."  See Gold Declaration at ¶3, Exhibit B at 4.

49.     Allianz then states in the report that less than 300 MT of copper cargo existed (e.g., "[i]t can be taken into consideration" that the 300 MT "might never have been available for shipment" and instead that "A total amount of 75 t  or 100 t of copper scrap would have be [sic] necessary for such an operation.").  See Gold Declaration at ¶3, Exhibit B at 4.

50.     Allianz then states in the report that "it can be assumed that the total quantity of 300 tons was never available for shipment, respectively was never in the custody of the sellers", theorizing instead that "[a] total amount between 60 tons and 80

9

tons of copper scrap would have been sufficient for the [recycling] operation." <u>See</u> Gold Declaration at ¶3, Exhibit B at 134.

51.     Allianz then informed Metallica that "no more than 50 – 60 MT of actual copper scrap would have been necessary to go through th[e] process" of "recycling back" copper from previously loaded containers "for the 15 involved containers." <u>See</u> Kim Affidavit at ¶ 16-17, Exhibit F at 4.

52.     Allianz has also cited the "Infidelity" exclusion in its Answer as a complete bar to coverage. The exclusion reads:

> In no case shall this insurance cover loss or damage caused by or resulting from misappropriation, secretion, conversion, infidelity or any dishonest act done by or at the instigation of the Assured or other party of interest to the underlying purchase or sale transaction, or their employees or agents (carriers for hire excepted).

<u>See</u> Allianz Answer, dated November 10, 2014 (Doc. 10) at pp. 35 - 36.

53.     As admitted in Allianz' Answer, the loss of the copper scrap was due to the conversion and misappropriation by Riverbend, not due to misconduct of McQan or Metallica. <u>See</u> Allianz Answer, dated November 10, 2014 (Doc. 10) at p. 36, ¶ 175.

54.     There is no allegation of any infidelity by McQan, the seller of the copper scrap, and there is no allegation of infidelity by their respective employees or agents. <u>See</u> Allianz Answer, dated November 10, 2014 (Doc. 10) at pp. 35 – 36.

55.     Riverbend (the entity Allianz believes is responsible for the theft) is not a signatory to Metallica's purchase transaction with McQan. <u>See</u> Kim Affidavit at ¶ 4, Exhibit A.

56.     Riverbend has no rights and obligations under Metallica's purchase transaction with McQan. <u>Id.</u>

57.     There is no mention of Riverbend in Metallica's purchase transaction with McQan.  Id.

58.     Riverbend's agreement with McQan was not incorporated by reference into the Metallica-McQan contract.  Id.

Dated:  January 26, 2015
        New York, New York

                                        By:    /s/ Dennis J. Nolan
                                               Joshua Gold, Esq.
                                               jgold@andersonkill.com
                                               Dennis J. Nolan, Esq.
                                               dnolan@andersonkill.com
                                               ANDERSON KILL P.C.
                                               1251 Avenue of the Americas
                                               New York, NY  10020
                                               Telephone:  212-278-1000

                                               *Attorneys for Plaintiff*
                                               *MCC Non Ferrous Trading Inc.*