UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MCC NON FERROUS TRADING INC.,

                                    Plaintiff,

                                                            Civil No. 14-CV-8302 (JCF)

                - against –

AGCS MARINE INSURANCE COMPANY,

                                    Defendant.

**PLAINTIFF'S REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT ON ALLIANZ' DEFENSES REGARDING THEFT WITH
FRAUDULENT INTENT AND THE "INFIDELITY" EXCLUSION**

ANDERSON KILL P.C.
Joshua Gold
Dennis J. Nolan
1251 Avenue of the Americas
New York, NY  10020
Telephone:  212-278-1000

*Attorneys for Plaintiff
MCC Non Ferrous Trading Inc.*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.   SUMMARY OF ARGUMENT ........................................................................... 1

II.  LEGAL ARGUMENT ....................................................................................... 2

     A.   NONE OF ALLIANZ' "DISPUTED FACTS" ARE GENUINE
         OR MATERIAL ........................................................................... 2

     B.   METALLICA HAD AN INSURABLE INTEREST IN COPPER
         SCRAP THAT DID EXIST—THE EXACT AMOUNT OF
         WHICH IS NOT AT ISSUE FOR THIS MOTION ................................ 4

     C.   ALL-RISK INSURANCE IS BROADLY CONSTRUED TO
         PROVIDE COVERAGE ................................................................... 6

     D.   *DAYCO CORP.* AND *FARR MAN COFFEE* DEFEAT ALLIANZ'
         ARGUMENTS ................................................................................ 7

     E.   THE "INFIDELITY" EXCLUSION DOES NOT APPLY ....................... 7

         1.   The Infidelity Exclusion, By Its Terms, Is Limited In Scope ................... 7

         2.   There Is Zero Evidence That Riverbend Was an Agent of
             McQan .................................................................................... 9

         3.   Allianz' Attempts to Expand the Infidelity Exclusion Are
             Improper ................................................................................. 10

CONCLUSION ........................................................................................................ 10

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Agric. Ins. Co. v. Ace Hardware Corp.*,
  214 F. Supp. 2d 413 (S.D.N.Y. 2002)........................................................................4

*Aurubis Buffalo, Inc. v. Lombard Gen. Ins. Co.*,
  No. 08-CV-00034, 2012 U.S. Dist. LEXIS 187362 (W.D.N.Y. Mar. 22, 2012)......................6

*Farr Man Coffee v. Chester*,
  No. 88 Civ. 1692, 1993 U.S. Dist. LEXIS 8992 (S.D.N.Y. June 28, 1993)......................3, 5, 7

*Fleet Bus. Credit LLC v. Global Aerospace Underwriting Managers*,
  646 F. Supp. 2d 473 (S.D.N.Y. 2009).......................................................................7

*Home Ins. Co. v. Chang*,
  360 N.E.2d 1089 (N.Y. 1977)..................................................................................6

*In re Balfour Maclaine Int'l Ltd.*,
  873 F. Supp. 862 (S.D.N.Y. 1995), *aff'd*, 85 F.3d 68 (2d Cir. 1996) ..........................9

*Ingersoll Milling Mach. Co. v. M/V Bodena*,
  829 F.2d 293 (2d Cir. 1987).....................................................................................6

*Litton Sys., Inc. v. Am. Tel. & Tel. Co.*, 700 F.2d 785 (2d Cir. 1983) ...........................4

*Olin Corp. v. Ins. Co. of N. Am.*,
  No. 84 Civ. 1968, 2006 U.S. Dist. LEXIS 8028 (S.D.N.Y. Mar. 2, 2006)............................9

*Pittman by Pittman v. Grayson*, 149 F.3d 111 (2d Cir. 1998).........................................4

*Plata Am. Trading, Inc. v. Lancashire*,
  214 N.Y.S.2d 43 (Sup. Ct. 1957)...............................................................................6

*Premium Mortg. Corp. v. Equifax Info. Servs., LLC*,
  583 F.3d 103 (2d Cir. 2009).....................................................................................10

*Rock v. Huffco Gas & Oil Co.*, 922 F.2d 272 (5th Cir. 1991) .......................................4

*Schering Corp. v. Pfizer Inc.*,
  189 F.3d 218 (2d Cir. 1999)......................................................................................3

*Simplexdiam, Inc. v. Brockbank*,
  727 N.Y.S.2d 64 (App. Div. 2001)..............................................................................7

ii

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Vanderwerken v. Bellinger*,
    900 N.Y.S.2d 170 (App. Div. 2010) ............................................................................6

*Weissman v. Galway Constr. Corp.*,
    659 N.Y.S.2d 42 (App. Div. 1997) ..............................................................................5

**Other Authorities**

Fed. R. Evid. 801(d)(2)(D) .............................................................................................3

nydocs1-1046840.3

# I.     <u>SUMMARY OF ARGUMENT</u>

Defendant AGCS Marine Insurance Company's ("Allianz") Memorandum of Law in Opposition to the Motion (Doc. 27) (the "Opposition" or "Opp.") is permeated with misstatements of law and fact.  While Allianz now concedes that theft by trickery is covered, the Opposition attempts to obscure the legal points it is required to confront under the Motion, by arguing that issues of fact abound.  Any such attempt to shift attention from the specific legal issues presented by the Motion (to irrelevant factual issues) is insufficient for Allianz to avoid summary judgment against it.

Allianz relies on a demonstrably false premise that no cargo ever existed.  Copper cargo did exist.  Nevertheless, Allianz argues that because it questions the cargo's existence, there was no insurable interest and no physical loss of the copper.  Allianz also claims that no insurable interest exists because Riverbend never intended to deliver the copper and, therefore, title to the cargo never passed.  Allianz, however, ignores its own policy language which provides that insurance coverage for all risks to the copper attaches when cargo leaves the warehouse (as Allianz admits the copper cargo did), regardless of where title resides.

There are also no material facts in dispute with respect to the infidelity exclusion.  Allianz has admitted that there was no infidelity by either Plaintiff MCC Non Ferrous Trading, Inc. ("Metallica") or McQan.  Thus, Allianz is left to its newly-minted argument to speculate that perhaps Riverbend was an "agent" of McQan.  Yet Allianz has already conceded after months of investigation that the relationship between McQan and Riverbend was one of buyer and seller – not one of principal and agent.[1]

---

[1]     *E.g.*, Opp., p. 21 (reciting Allianz' affirmative defenses that "McQan as buyer, and Riverbend, as seller, were allegedly parties to Sales Contract No. MQ0723 dated September 30, 2013….").

Further, Allianz cannot establish as a matter of law that Metallica's interpretation of the infidelity exclusion is unreasonable—especially because courts construe exclusions from insurance coverage narrowly.   A policyholder would reasonably conclude that the infidelity exclusion does not apply to dishonest acts of an unknown third-party, with whom it did not contract.

## II.   <u>LEGAL ARGUMENT</u>

### A.   <u>None of Allianz' "Disputed Facts" Are Genuine or Material</u>

Allianz devotes much of its Opposition arguing facts and law that are irrelevant to the Motion.  Simply put, Allianz cannot avoid summary judgment on theft by trickery and the infidelity exclusion by arguing about the exact amount of copper stolen.[2]

It is not credible for Allianz to argue that the copper "never existed" and "was a complete fabrication" when Allianz' own filings admit that copper existed:

- "the *vast majority* of the copper scrap that MCC alleges was lost simply never existed"[3];

- "the amount of 307.03 tons of copper scrap never existed *in total*"[4];

- "During these operations *the copper cargoes had been exchanged* against the actual loads of bricks and slag."[5];

- "It can be assumed that *the 15 container loads of copper scrap* were unloaded one after another on the spot on the

---

[2]     At the Preliminary Conference, the Court ordered that discovery of third-parties with knowledge of the copper cargo loads can proceed after determination of the legal issues that are the subject of this Motion (Doc. 17).

[3]     Opp., p. 12 (emphasis added).

[4]     *Id*. (emphasis added).

[5]     Gold Decl. (Doc. 19), Ex. B., p. 157, section 17. "Conclusion", at p.30 (emphasis added).

Philippines by sellers acting under their alias 'Riverbend Enterprises.'"[6]

These admissions demonstrate beyond any reasonable doubt that the copper cargo existed—even if there remains a dispute between the parties as to the exact amount.

Allianz attempts to create a dispute over the copper's existence by arguing that its own investigation report is inadmissible hearsay. But elements of an insurance company's investigation report can be admissible under Fed. R. Evid. 801(d)(2)(D) when they constitute admissions against interest. *See Farr Man Coffee v. Chester*, No. 88 Civ. 1692, 1993 U.S. Dist. LEXIS 8992, at *n.30 (S.D.N.Y. June 28, 1993) (ruling that investigation report prepared for insurance company was admissible under 801(d)(2)(D) as an admission against the insurance company's interest).

Here, Allianz' investigator sought information provided by, among others, third-parties and repeatedly drew inferences and conclusions from the data received. For example, Allianz "confirmed" with the witnesses that they saw no more than 60 – 80 tons of copper scrap available at one time at the loading point, and used that to provide its "opinion" that the copper scrap was supposedly "recycled". Gold Decl., Ex. B, at 133-34. Similarly, the investigator used the photos provided by the witnesses to identify the warehouse and "prove" that the container locks had been "manipulated" prior to loading and delivery, among other things. *Id.* at 140. Thus, the statements about the cargo's existence are admissible statements against Allianz' interest. S*ee Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 239 (2d Cir. 1999) (finding surveys admissible as party admissions even though based on hearsay where party drew inferences from

---

[6]  *Id.* (emphasis added). According to the recently filed declaration of Jochen Stuhmer ("Stuhmer") of Reck & Co. GmbH (Doc. 29), these statements are the "conclusions reached by Reck following its investigation [] found in section 17 of the final Investigation and Survey Report" for Allianz and are apparently distinct from the "narrative" Allianz claims in sections 1, 2, 3 and 7 of its report.  (Doc. 29, ¶¶ 7, 10, pp. 2 – 3).

underlying hearsay, "thus manifest[ing] an adoption or belief in its truth.").[7]  Given the opinions drawn by Allianz' own investigator from the third-party statements, its attempt to cast the admissions as mere recitations of third-party information is without merit.[8]  In essence, Allianz wishes to distance itself from the Reck investigation report by disavowing: (1) the over 400 photographs taken and provided by third-parties; (2) the weight table, (3) the multiple interviews it took of third-party witnesses to the loading of the copper cargo and delivery to the Manila port; and (4) the "conclusions" of the investigator that copper existed.

In the section of the report detailing <u>Reck's own inspection of the cargo containers</u> delivered to Rotterdam, Allianz' investigation team remarked that "[s]ome remains of the origin [sic] copper cargo could be ascertained (photo 29) inside certain containers."[9]

Tellingly, Mr. Stuhmer cannot bring himself to make any assertion that the copper scrap did not exist at all.  *See* Doc. 29.  Allianz' argument that the copper never existed is utterly baseless, and there is no <u>genuine</u> issue of fact on that issue.

**B.**     **<u>Metallica Had an Insurable Interest In Copper Scrap That Did Exist—The Exact Amount of Which Is Not At Issue for This Motion</u>**

Allianz further attempts to obscure the issues by arguing that Metallica could never have an insurable interest in, or sustain a physical loss of, non-existent copper.  Opp, p. 14.

---

[7]     *See also Agric. Ins. Co. v. Ace Hardware Corp.*, 214 F. Supp. 2d 413, 416 (S.D.N.Y. 2002) (finding admissible report by company superintendent who did not witness accident because he drew inferences from and adopted the eyewitness statements).

[8]     Opp., p. 5 (citing *Rock v. Huffco Gas & Oil Co.*, 922 F.2d 272, 281 (5th Cir. 1991) ("Nothing in the…reports, themselves, indicates that the defendants adopted the version of the facts as reported by [declarant]."); *Pittman by Pittman v. Grayson*, 149 F.3d 111, 124 (2d Cir. 1998) (party's employee merely relayed what someone else had told her a non-party said without adopting the statement of the unknown third-party); *Litton Sys., Inc. v. Am. Tel. & Tel. Co.*, 700 F.2d 785, 816 (2d Cir. 1983) (attorney's notes simply recited gossip he heard around the office, without adopting or forming conclusions as to those statements)).

[9]     Gold Decl., Ex. B, section 6.4, at p. 138.

4

Because Allianz has already admitted that copper existed, however, any argument predicated on the "non"-existence of copper scrap necessarily fails.

Furthermore, Metallica clearly satisfies the insurable interest requirement to establish covered loss. The "existence of an insurable interest is not dependent on title." *Farr Man Coffee,* 1993 U.S. Dist. LEXIS 8992, at *83 (ruling "If [an insured] would sustain [a] loss [through deprivation of the subject matter insured], it is immaterial whether he has, or has not, any title in, or lien upon, or possession of, the property itself."); *Weissman v. Galway Constr. Corp.*, 659 N.Y.S.2d 42, 43 (App. Div. 1997) ("A legal or equitable interest in the property insured is not necessary to support an insurable interest."). Instead, as Allianz itself states, a party has an insurable interest in property if it will gain an advantage by the property's existence or suffer a loss by its destruction. Opp., p. 14 (citing N.Y. Ins. L. § 3401). Thus, title is not required to pass for Metallica to have an insurable interest.[10]

In addition, Section 19's "Warehouse to Warehouse" grants coverage from the time the goods leave the warehouse. Here, it is undisputed that copper scrap departed the warehouse before it was stolen. *See* Kim Aff. (Doc. 20), Ex. F at 3 – 4; Doc. 29 at 46 ("It can be assumed that *the 15 container loads of copper scrap* were unloaded one after another on the spot on the Philippines by sellers acting under their alias 'Riverbend Enterprises', after the trailers had returned from the container terminal's side gate.").[11] In fact, it is exclusively Allianz' theory of the theft that the cargo container doors were "manipulated" so that the copper inside could be

---

[10]   Allianz' cited cases (Opp., p. 13) are distinguishable in that none involve title in the context of insurable interest.

[11]   Emphasis added. Metallica does not agree with Allianz' theory about the "recycling" of only 50 MT to 100 MT of copper and believes the evidence will show the full load of more than 307 MT of copper scrap.

stolen after it was transported to the Manila terminal and thereafter replaced with debris. Therefore, the coverage attached and Metallica had an insurable interest in the copper scrap. [12]

Allianz cites to *Plata Am. Trading, Inc. v. Lancashire*, 214 N.Y.S.2d 43, 47 (Sup. Ct. 1957), but that case is distinguishable because the tallow never left the "warehouse," and thus the risk did not attach. Allianz also attempts to argue that Metallica cannot establish a physical loss of covered property. But all of the cases the Opposition cites at pages 16 – 17 are irrelevant under the facts of this case. For example, in *Aurubis Buffalo, Inc. v. Lombard Gen. Ins. Co.*, No. 08-CV-00034, 2012 U.S. Dist. LEXIS 187362 (W.D.N.Y. Mar. 22, 2012), it was "undisputed" that when the shipment left the warehouse, it did not contain the copper; here, Allianz has already concluded that the containers were stuffed with copper when they left the warehouse and when they reached the terminal. Kim Aff., Ex. F, p. 4, ¶16.

## C.   <u>All-Risk Insurance Is Broadly Construed to Provide Coverage</u>

Allianz vacillates between admitting that all-risk marine cargo insurance policies cover, among other things, theft by trickery, and then arguing that the particular trickery it alleges in this case is not covered due to Riverbend's alleged intent to steal all along. For example, Allianz argues that Riverbend had "no intent of delivering the copper scrap." Opp., p. 13, n.9.

Allianz' argument over intent is irrelevant under an all-risk insurance policy analysis. *Ingersoll Milling Mach. Co. v. M/V Bodena*, 829 F.2d 293, 307 (2d Cir. 1987) (holding

---

[12]   Allianz contends that Metallica does not have an insurable interest under Clauses 6 and 73 of the Policy because, absent copper, no shipment could trigger coverage. Opp. at 15. The fact that copper did exist and left the warehouse eviscerates Allianz' argument and undermines its cases. *See Home Ins. Co. v. Chang*, 360 N.E.2d 1089,1090 (N.Y. 1977) (finding no insurable interest because policy stated that "insurable interest" excluded FOB shipments of the type at issue and where insurance company incurred no risk under warehouse to warehouse clause); *Vanderwerken v. Bellinger*, 900 N.Y.S.2d 170,174 (App. Div. 2010) (stating that insurable interest did not exist because there was no structure on the premises).

6

all-risk cargo policy "covers all losses which are fortuitous no matter what caused the loss, including the [policyholder]'s negligence . . ."); *Fleet Bus. Credit LLC v. Global Aerospace Underwriting Managers*, 646 F. Supp. 2d 473, 484 (S.D.N.Y. 2009) (this Court holding that policyholder "need not prove the cause of the loss").  Allianz' own cited case makes this clear.  *See Simplexdiam, Inc. v. Brockbank*, 727 N.Y.S.2d 64, 67 (App. Div. 2001) (holding that insurance company was liable for missing jewelry inventory "notwithstanding that [the loss] is 'unexplained' and 'mysterious'").

**D.     *Dayco Corp.* and *Farr Man Coffee* Defeat Allianz' Arguments**

Allianz attempts to distinguish away *Dayco Corp.* and *Farr Man Coffee* because there was a concession in those cases that the cargo was never "received". Opp., p. 14.  Allianz, however, has already conceded that the copper scrap was never received in Rotterdam. Doc. 29 at 27 ("Upon our inspection in Rotterdam none of the 15 containers had been loaded <u>with its original cargo of copper scrap</u>") (emphasis added).  *Dayco Corp.* and *Farr Man Coffee* apply.

**E.     THE "INFIDELITY" EXCLUSION DOES NOT APPLY**

      1.     The Infidelity Exclusion, By Its Terms, Is Limited In Scope

The Opposition argues that the Policy's "Infidelity" clause at paragraph 58 (the "<u>Infidelity Exclusion</u>") applies because "other party of interest" is meant to be interpreted as plural and because "transaction" is meant to capture multiple sales—not just the sales contract between Metallica and its counter-party, McQan.  Allianz' interpretation is not supported by the actual terms of the clause it drafted, which reads:

> 58. **Infidelity**
> In no case shall this insurance cover loss or damage caused by or resulting from misappropriation, secretion, conversion, infidelity or any dishonest act done by or at the instigation of the Assured or other party of interest to the underlying purchase or sale transaction, or their employees or agents (carriers for hire excepted).

7

Allianz asserts that "other party of interest" is plural and the article "the" cannot be read to modify "other party of interest".[13]  Allianz' interpretation is not in keeping with the structure of the clause.  It is clear that articles and other modifiers are intended to apply to certain phrases.  For example, a fair reading of the exclusion is that "the underlying" is meant to modify not only "purchase", but also "sale transaction".  It is also a fair reading that "their" modifies not only "employees" but "agents" too.  Indeed, Allianz interpolates "their" before "agents" in its ensuing argument that Riverbend is an "agent" of McQan (Opp., p. 21).  Despite this, Allianz arbitrarily and without any support says that "'other party of interest' need not be read in the singular." *Id.* at p. 19.  But, it is more than reasonable to read that phrase in the singular and interpose the word "the", given the structure and context of the clause.  Such a reading is also consistent with the way in which Allianz refers to "party" when it seeks to use the plural form (Paragraph 52 uses the phrases "or <u>any</u> other party" and "other part<u>ies</u>" to denote the plural of "party".) (emphasis added).

Furthermore, "the underlying purchase or sale transaction" is certainly intended to be a single transaction between two parties (a buyer and a seller), otherwise the term "underlying" would be superfluous.  If the purchase or sale transaction was to genuinely capture transactions preceding the "underlying purchase or sale transaction", the clause would need to read "the transaction underlying the underlying purchase or sale transaction".  Allianz seeks to discredit the notion that the Infidelity Exclusion is limited to a single transaction by asserting that Metallica was also a party to a sales transaction with Aurubis.  But the Infidelity Exclusion refers to a purchase transaction and a sales transaction in the disjunctive, not the conjunctive.  Thus,

---

[13]   Further proof of Allianz' strained interpretation comes from its denial letter, wherein, in order to expand the meaning of the Infidelity Clause, Allianz quoted the clause to read: "**<u>another</u>** party of interest to the purchase or sale transaction." Kim Aff., Ex. F, p. 6 (emphasis added).

they have to be viewed separately: on the Metallica purchase transaction, the "other party of interest" is McQan (the seller); on the Metallica sale transaction the "other party of interest" is Aurubis.  Under neither of those transactions is Riverbend the "other party of interest."

Even Allianz does not truly believe in its argument.  In an earlier section of the Opposition, Allianz describes two separate and distinct transactions, not one: "If Riverbend never intended to deliver the copper scrap to McQan, then McQan could never deliver it to MCC."  Opp., p. 13.  Even more revealing is Allianz' description of the McQan agreement to purchase copper from Riverbend: "the Riverbend-McQan transaction". *Id*. at n. 9. The undisputed evidence is that there were distinct transactions, separated by time, contract language, and parties thereto.

### 2.   There Is Zero Evidence That Riverbend Was an Agent of McQan

Allianz now floats the argument that Riverbend was an "agent" of McQan.  Despite a five-month investigation and Allianz having over a year to inquire about such a possibility with third-parties, there is no evidence of an "agency" agreement between McQan and Riverbend.  To the contrary, Allianz' own claims handler, Report, pleading, and Opposition recognize that the relationship between McQan and Riverbend was one of buyer and seller—not agent and principal.[14]   At any rate, Allianz' new agency defense should be deemed waived or Allianz should otherwise be estopped from making it.[15]

---

[14]   Opp., p. 21; Kim Aff., Ex. F, p. 2, ¶1.

[15]   *See Olin Corp. v. Ins. Co. of N. Am.*, No. 84 Civ. 1968, 2006 U.S. Dist. LEXIS 8028, at *9-10 (S.D.N.Y. Mar. 2, 2006) ("where, as here, an insurer actually asserts certain policy defenses, … the insurer is deemed to have waived any other unasserted grounds for refusing coverage"); *In re Balfour Maclaine Int'l Ltd.*, 873 F. Supp. 862, 871 (S.D.N.Y. 1995), *aff'd*, 85 F.3d 68 (2d Cir. 1996) ("even if an insurer does not have actual knowledge of all the pertinent facts about a defense when it declines liability on other grounds, if it has sufficient information to put it on notice of the defense, the insurer has constructive knowledge, which is sufficient for waiver").

9

3.      Allianz' Attempts to Expand the Infidelity Exclusion Are Improper

Riverbend's sale of copper to McQan does not make it the "party of interest" to a separate agreement between McQan and Metallica.  There is no mention of Riverbend in that agreement and they were not a party to it.  Furthermore, prior to Metallica's purchase of copper from McQan, Metallica had never even heard of Riverbend, did not know they sold copper scrap to McQan pursuant to a different contract, and had never (at any time) had dealings with Riverbend.  Kim Aff., ¶ 9.  Furthermore, there is no interest in the McQan – Metallica transaction that Riverbend could enforce.[16]  The exhibits attached to the Doc. 28 declaration do not alter these facts.

**CONCLUSION**

For the foregoing reasons, Metallica respectfully requests that its Motion for Summary Judgment be granted in full.

Dated:      March 25, 2015
            New York, New York

By:     */s/ Joshua Gold*
        Joshua Gold, Esq.
        jgold@andersonkill.com
        Dennis J. Nolan, Esq.
        dnolan@andersonkill.com
        ANDERSON KILL P.C.
        1251 Avenue of the Americas
        New York, NY 10020
        Tel.:  212-278-1000
        *Attorneys for Plaintiff*
        *MCC Non Ferrous Trading Inc.*

---

[16]   *See, e.g., Premium Mortg. Corp. v. Equifax Info. Servs., LLC*, 583 F.3d 103, 108 (2d Cir. 2009) ("A non-party to a contract governed by New York law lacks standing to enforce the agreement in the absence of terms that 'clearly evidence[] an intent to permit enforcement by the third party' in question.").