UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -:
MCC NON FERROUS TRADING INC.,        :        14 Civ. 8302 (JCF)
                                     :
            Plaintiff,               :           MEMORANDUM
                                     :           AND  ORDER
      - against -                    :
                                     :
AGCS MARINE INSURANCE COMPANY,       :
                                     :
            Defendant.               :
- - - - - - - - - - - - - - - - - - -:
JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

    This is a case of mysteriously missing metal.  The plaintiff,
MCC Non Ferrous Trading Inc. ("MCC" or the "Assured"), alleges that
approximately 307 tons of scrap copper that it had purchased
disappeared while en route from Manila to Rotterdam.  MCC seeks a
declaration that the loss is covered under an all-risk insurance
policy issued by defendant AGCS Marine Insurance Co. ("AGCS").
AGCS counters that the scrap metal did not exist for the purposes
of the insurance policy, or that it did not exist "in total," or
that it did not exist, full stop.  The parties have filed dueling
motions for partial summary judgment seeking rulings on certain
issues underlying the claim for coverage.  For the reasons that
follow, both MCC's motion and AGCS' cross-motion are denied.

Background

    MCC trades in non-ferrous metals and, as part of its business,
purchases and resells copper scrap.  (Local Rule 56.1 Statement of
Undisputed Facts in Support of Plaintiff's Motion for Summary
Judgment on Allianz' Defenses Regarding Theft with Fraudulent
Intent and the "Infidelity" Exclusion ("Pl. 56.1 Statement"), ¶¶ 1-

1

2).   MCC entered into a contract, dated October 16, 2015, with McQan Corporation by which MCC purchased "a trial lot" of approximately 300 metric tons of No. 1 copper wire scrap[1] to be delivered C.I.F.[2] to "Hamburg, Germany, or Brimahaven, Germany,[3] or Parity."  (McQan Contract,  ¶¶ 1-2, 4).  For its part, McQan had apparently contracted with an entity called Riverbend Enterprises on September 30, 2013, to procure the scrap it later sold to MCC.  (B. Kim Aff., ¶ 9; Investigation Report -- File No. 58709 -- Preliminary dated Jan. 13, 2014 ("Preliminary Investigation Report"), attached as Exh. B to Declaration of Joshua Gold dated Jan. 26, 2015 ("Gold Decl."), at 223-28).  MCC agreed to resell the scrap to a copper smelter called Aurubis AG Recycling ("Aurubis")

---

[1] The contract identifies the goods as "[c]opper wire scrap as per ISRI Berry."  (Purchase Agreement No. M1313-P dated Oct. 16, 2013 ("McQan Contract"), attached as Exh. A to Affidavit of Brian Kim dated Jan. 26, 2015 ("B. Kim Aff."), ¶ 1).  "Berry" is code used by the Institute of Scrap Recycling Industries, Inc. ("ISRI") to denote No. 1 copper wire.  See ISRI, Scrap Specifications Circular 2015 at 4, available at http://www.isri.org/docs/default-source/commodities/specsupdatejuly2014.pdf.

[2] "C.I.F." is an abbreviation of "cost, insurance, and freight," which is a

> mercantile-contract term allocating the rights and duties of the buyer and seller of goods with respect to delivery, payment, and risk of loss, whereby the seller must (1) clear the goods for export, (2) arrange for transportation by water, (3) procure insurance against the buyer's risk of damage during carriage, and (4) pay the costs of shipping to the port of destination.

Black's Law Dictionary 424 (10th ed. 2014).

[3] "Brimahaven" is apparently a misspelling of Bremerhaven, a city in Germany, as an internet search for "Brimahaven" yields only references to "Brimhaven," an imaginary town in Runescape, an on-line fantasy game.

and to ship it C.I.F. to Rotterdam, with delivery to be taken in November or December 2013. (Contract No. 30635856 dated Oct. 7, 2013, and Amendment to Contract No. 30535856 dated Oct. 22, 2013 (together, the "Aurubis Contract"), attached as Exh. C to B. Kim Aff.; B. Kim Aff., ¶ 10). However, when the ship arrived in Rotterdam, the cargo containers were filled with construction materials and debris rather than copper wire scrap, and Aurubis therefore refused the shipment. (Kim Aff., ¶ 11).

On December 18, 2013, MCC informed McQan of the situation, asking to be reimbursed pursuant to the provision of the McQan Contract requiring McQan to provide insurance for the shipment. (McQan Contract, ¶ 16; Letter of Brian Kim dated Dec. 18, 2013, attached as Exh. D to B. Kim Aff.).

MCC also reported a claim "on a contingency basis" to AGCS, the issuer of an Ocean Marine Cargo Policy that provides MCC with coverage for all shipments made after January 15, 2013, of any "lawful goods and/or merchandise consisting primarily of Scrap Metals and/or Metallurgic Coke and/or Unfinished Metal products and/or Ores, and/or Concentrates and/or Alloys." (E-mail of Abigail Ainsley dated Dec. 20, 2013, attached as Exh. E to B. Kim Aff.; Ocean Marine Cargo Policy OC91257500 ("Policy"), attached as Exh. A to Gold Decl., at 7, 41).[4] Coverage attaches

> from the time the goods leave the warehouse at the place
> named in the certificate, special policy, or declaration
> for the commencement of transit and continues during the
> ordinary course of transit . . . until the goods are

---

[4] The Policy is not paginated, so I use the page numbers assigned by the court's Electronic Case Filing system.

> delivered to the final warehouse at the destination named in the certificate, special policy, or declaration . . . .

(Policy at 10).  The Policy insures "all shipments by or to the Assured for their account as Principals or as Agents for others," excluding "goods purchased by the Assured on C.I.F." unless coverage is "otherwise provided" in the Policy.  (Policy at 7).  Goods purchased C.I.F. may be covered under Clause 52, which provides for coverage of "goods purchased and paid for by the Assured on terms which do not obligate them to provide insurance, if there is loss or damage from a peril insured [by the Policy], and the Assured cannot collect from the seller, insurance provided by the seller, or other party, because of refusal or inability to pay" (Policy at 19); or Clause 53, which protects goods covered by other insurance "[i]f the Assured cannot collect under other insurance for loss and/or damage by perils covered under the terms of th[e] Policy.  (Policy at 19-20).

An "Infidelity Exclusion" exempts from coverage "loss or damage caused by or resulting from misappropriation, secretion, conversion, infidelity or any dishonest act done by or at the instigation of the Assured or other party of interest to the underlying purchase or sale transaction, or their employees or agents." (Policy at 22).  Finally, the Policy includes a provision titled "Insurable Interest Admitted," which provides that "the interest of the named Assured shall at all time be admitted during the entire transit" if "the named Assured is responsible for insuring the overseas voyage and [] such shipment is insured by

4

th[e] Policy." (Policy at 24).

In response to MCC's notice of claim, AGCS commenced an "investigation into the underlying facts surrounding th[e] fraud . . . under a reservation of rights." (Letter of Thomas Curran dated May 14, 2014 ("Curran Letter"), attached as Exh. F to B. Kim Aff., at 1; Preliminary Investigation Report; Investigation and Survey Report -- File No. 58709, attached as Exh. B to Declaration of Jochen Stühmer dated March 10, 2015). In a May 14, 2014 letter explaining its position regarding coverage, AGCS pointed out that Clause 52 requires a "refusal or inability to pay" on the part of the seller, the insurance provided by the seller, or other party. (Curran Letter at 1). AGCS explained that "the insurance provided by 'the seller or other party' (Riverbend Enterprises) with Filipino insurer Charter Ping An is said to be 'counterfeit' by attorneys claiming to represent them." (Curran Letter at 1; Preliminary Investigation Report at 378).

The letter then summarized the "salient facts" gleaned from the investigation and concluded that the loss was not covered. (Curran Letter at 2-5). According to the Curran Letter, a representative of Riverbend witnessed the loading of the copper wire into the first four of fifteen shipping containers, and representatives from McQan witnessed the loading of the remaining eleven. (Curran Letter at 3). The McQan representatives stated that they saw only 50 to 60 tons of copper wire at any one time. (Curran Letter at 3). The working theory regarding the disappearance of the scrap is that, after each container was sealed

and the witnesses to the sealing process left, Riverbend took the container to another location, replaced the copper scrap with construction debris without breaking the container's seal, delivered the container to the location where it would be loaded onto the ship, and thereafter reused the copper scrap to simulate the loading of the next container. (Curran Letter at 4). AGCS' current position is that, if any copper scrap existed -- which it does not concede -- it consisted of only 60 to 80 tons, and even that amount "did not exist for purposes of the insurance provided under the Policy." (Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment on Defendant's Defenses Regarding Theft with Fraudulent Intent and the "Infidelity" Exclusion and in Support of Defendant's Cross-Motion for Partial Summary Judgment on the Interpretation of Clauses 52 and 53 ("Def. Memo.") at 12-13).

MCC filed this case in October 2014 and the parties thereafter consented to my jurisdiction for all purposes pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. No discovery has been taken, as setting a case management schedule was deferred until these motions are decided. (Order dated Dec. 19, 2014; Declaration of John A.V. Nicoletti dated March 11, 2015 ("Nicoletti Decl."), ¶ 6).

<u>Discussion</u>

A.   <u>Legal Standards</u>

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with

the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" <u>Marvel Characters, Inc. v. Simon</u>, 310 F.3d 280, 285-86 (2d Cir. 2002) (alteration in original) (citing former Rule 56(c)); <u>see also</u> <u>Andy Warhol Foundation for the Visual Arts, Inc. v. Federal Insurance Co.</u>, 189 F.3d 208, 214 (2d Cir. 1999). The moving party bears the initial burden of identifying "the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  The opposing party then must come forward with "specific facts showing that there is a genuine issue for trial." <u>Id.</u> at 324 (internal quotation marks omitted). Where the nonmovant fails to make "a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment must be granted.  <u>Id.</u> at 322.

In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986); <u>Vann v. City of New York</u>, 72 F.3d 1040, 1048-49 (2d Cir. 1995).  Nevertheless the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party," <u>Anderson</u>, 477 U.S. at 249, and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative.  <u>Id.</u> at 249-50.  "Where the record taken as a whole could not lead a

7

rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" <u>Matsushita Electric Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (quoting <u>First National Bank of Arizona v. Cities Service Co.</u>, 391 U.S. 253, 289 (1968)).

In addition, a party may object if the material supporting or disputing a fact cannot be presented in an admissible form.  <u>See</u> Fed. R. Civ. P. 56(c)(2).  Accordingly, "only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." <u>Raskin v. Wyatt Co.</u>, 125 F.3d 55, 66 (2d Cir. 1997).

Generally, granting summary judgment before the parties have engaged in discovery is disfavored.  <u>See, e.g.</u>, <u>Walden v. Sanitation Salvage Corp.</u>, No. 14 Civ. 112, 2015 WL 1433353, at *5 (S.D.N.Y. March 30, 2015) ("Courts in the Second Circuit routinely deny or defer motions for summary judgment when the non-movant has not had an opportunity to conduct discovery and submits an affidavit or declaration that meets the requirements set forth in Rule 56(d)."); <u>Simmons v. Pedroza</u>, No. 10 Civ. 821, 2011 WL 814551, at *4 (S.D.N.Y. March 7, 2011) (collecting cases).  However, when the issue to be decided is limited to a pure question of law, such as the interpretation of unambiguous contract language, summary judgment may be appropriate even before the commencement of discovery.  <u>See</u> <u>American Steamship Owners Mutual Protection and Indemnity Association v. Lafarge North America, Inc.</u>, No. 06 Civ. 3123, 2008 WL 4449353, at *5-6 (S.D.N.Y. Sept. 29, 2008).

Similarly, "where it is clear that the nonmoving party cannot defeat the motion by showing facts sufficient to require a trial for resolution, summary judgment may be granted notwithstanding the absence of discovery." XL Specialty Insurance Co. v. Agoglia, No. 08 Civ. 3821, 2009 WL 1227485, at *6 (S.D.N.Y. April 30, 2009) (citing Gottlieb v. County of Orange, 84 F.3d 511, 519 (2d Cir. 1996)), reconsideration granted on other grounds sub nom. Murphy v. Allied World Assurance Co., No. 08 Civ. 3821, 2009 WL 1528527 (S.D.N.Y. May 29, 2009).

Finally, courts have approved the use of motions for partial summary judgment the decision, while not dispositive of an entire claim, will serve to focus the issues prior to trial. See, e.g., Buffalo Central Terminal v. United States, 886 F. Supp. 1031, 1037 (W.D.N.Y. 1995) (agreeing that "a summary judgment motion should not only be assessed in terms of whether it defeats an entire lawsuit, but should also be used by the Court to 'weed out' untenable legal theories/claims and focus the issues for trial"); Ajir v. Exxon Corp., No. C93-20830, 1995 WL 261411, at *4 (N.D. Cal. May 2, 1995) (allowing motion for partial summary judgment that would "help[] to focus the issues to be litigated, thus conserving judicial resources"); Lotus Development Corp. v. Borland International, Inc., 788 F. Supp. 78, 82 (D. Mass. 1992) (allowing parties to file revised summary judgment motions to "focus their arguments more precisely, on the chance this may lead to disposition without the high costs of trial, and in any event will better focus issues for trial if a trial is necessary").

9

B.   Infidelity Exclusion

MCC seeks a ruling that the Infidelity Exclusion does not apply to the loss at issue here.  As noted, under this exclusion, the Policy does not cover losses caused by certain dishonest acts "done by or at the instigation of the Assured or other party of interest to the underlying purchase or sale transaction, or their employees or agents."   (Policy at 22).  MCC contends that it is entitled to summary judgment on this issue for five reasons, some of which are interconnected: (1) there is no evidence of dishonesty by MCC or McQan or their agents; (2) Riverbend's actions cannot trigger the clause because it is not a party to the relevant underlying agreement, the McQan Contract; (3) by its terms, the exclusion can apply only to a single transaction between MCC (as the insured) and a single counterparty, so any agreement other than the McQan Contract is irrelevant; (4) exclusions from insurance coverage are to be construed narrowly; and (5) to the extent the provision is ambiguous, it must be construed against the insurer. (Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment on Allianz' Defenses Regarding Theft with Fraudulent Intent and the "Infidelity" Exclusion ("Pl. Memo.") at  18-23).

Summary judgment is not appropriate at this juncture. Although AGCS has investigated the situation as part of its processing of the claim, discovery has not yet commenced.  AGCS seeks to explore further the relationship between McQan and Riverbend and the series of transactions that preceded MCC's claim, and to depose witnesses cited in the Preliminary and Final

10

Investigation Reports, as well as others.  (Def. Memo. at 20-21;
Nicoletti Decl., ¶¶ 4-8).  At this early stage in the litigation,
I will not pretermit AGCS' ability to engage in reasonable
discovery on these issues, especially as it is the defendant's
burden to show that the loss comes within one of the Policy's
exclusions.[5]  See Great Lakes Reinsurance (UK) PLC v. Fortelni, 33
F. Supp. 3d 204, 208 (E.D.N.Y. 2014) (citing Pan American World
Airways, Inc. v. Aetna Casualty & Surety Co., 505 F.2d 989, 999 (2d
Cir. 1974)).  Given the denial of summary judgment, interpretation
of the Infidelity Exclusion is unnecessary to resolve this branch
of MCC's motion.  However, because the meaning of the provision
will likely affect the scope of the parties' discovery, I will
address it.

Words and phrases in an insurance policy are to be given their

---

[5] MCC contends that AGCS has waived any defense based on an
agency relationship between McQan and Riverbend.  (Plaintiff's
Reply Memorandum of Law in Support of Motion for Summary Judgment
on Allianz' Defenses Regarding Theft with Fraudulent Intent and the
"Infidelity" Exclusion ("Pl. Reply") at 9 & n.15).  "New York law
establishes that an insurer is deemed, as a matter of law, to have
intended to waive a defense to coverage where other defenses are
asserted, and where the insurer possesses sufficient knowledge
. . . of the circumstances regarding the unasserted defense."
Estee Lauder Inc. v. OneBeacon Insurance Group, LLC, 62 A.D.3d 33,
35, 873 N.Y.S.2d 592, 594 (1st Dep't 2009) (internal quotation
marks omitted), abrogated on other grounds by KeySpan Gas East
Corp. v. Munich Reinsurance America, Inc., 23 N.Y.3d 585, 992
N.Y.S.2d 185 (2014).  However, "an insurer may reserve the right to
disclaim on such different or alternative grounds as it may later
find to be applicable."  Estee Lauder, 62 A.D.2d at 35, 873
N.Y.S.2d at 594.  The Curran Letter, which MCC has submitted as
support for its motion, reserves AGCS' rights to present defenses
other than those it outlines.  (Curran Letter at 1, 7).  And AGCS'
Answer disclaims coverage pursuant to the Infidelity Exclusion,
describes the allegedly "fraudulent scheme" at issue, and asserts
that Riverbend was "party to the fraudulent scheme" that resulted
in the claimed loss.  (Answer, ¶¶ 124-151, 168-176).

natural and ordinary meaning, "such as the average policyholder of ordinary intelligence, as well as the insurer, would attach to it." Federal Insurance Co. v. International Business Machines Corp., 18 N.Y.3d 642, 648, 942 N.Y.S.2d 432, 435 (2012) (internal quotation marks omitted); see also Olin Corp. v. American Home Assurance Co., 704 F.3d 89, 99 (2d Cir. 2012).  A contract provision is ambiguous if it is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."  Olin Corp., 704 F.3d at 99 (citation omitted).

MCC's interpretation of the Infidelity Exclusion is too restrictive.  It contends, first, that the phrase "other party of interest to the underlying purchase . . . transaction" can refer only to McQan as the lone signatory (besides MCC) to the McQan Contract.  (Pl. Memo. at 18).  As AGCS points out, however, an entity can be "party of interest" to a transaction even if it is not a signatory to the contract that gives rise to the transaction. (Def. Memo. at 19).  For example, a third-party beneficiary is a party of interest to an agreement even though not a party to it. The plaintiff next argues that, because the provision "applies to dishonest acts 'done by the . . . other party of interest to the underlying purchase or sale transaction" -- that is, because both "party" and "transaction" are singular -- only one buyer, one seller, and one agreement can be implicated in the Infidelity

Exclusion.  (Pl. Memo. at 19-20; Pl. Reply at 8).  But many contracts have more than two parties (or parties in interest), and there is no rational explanation for why AGCS would except such contracts from the Infidelity Exclusion.  Moreover, many transactions comprise multiple contracts.  See, e.g., Commander Oil Corp. v. Advance Food Service Equipment, 991 F.2d 49, 53 (2d Cir. 1993) (citing 6 Williston, Contracts, § 863, at 275 (3rd ed.)); 11 Williston on Contracts § 30:26 (4th ed.).  No reasonable policyholder would imagine that the Infidelity Exclusion encompasses losses caused by dishonest acts if and only if the transaction at issue involves only two signatories and one contract, thereby providing coverage for losses from tainted transactions as long as they include multiple parties or agreements.

Because MCC's interpretation of the Infidelity Exclusion is unreasonable, there is no basis for a finding that the provision is ambiguous.  See, e.g., Readco, Inc. v. Marine Midland Bank, 81 F.3d 295, 299 (2d Cir. 1996) ("A contract is ambiguous where reasonable minds could differ on what a term means, but no ambiguity exists where the alternative construction would be unreasonable." (internal citations omitted)).  Therefore, I need not address the parties' disagreements about the interrelation between New York's rule allowing admission of extrinsic evidence to elucidate the meaning of ambiguous contractual terms, see, e.g., City of New York v. Evanston Insurance Co., 39 A.D.3d 153, 156, 830 N.Y.S.2d 299, 302 (2d Dep't 2007) ("Where the language of a policy of insurance

is ambiguous and susceptible of more than one reasonable interpretation, the parties may submit extrinsic evidence as an aid in construction . . . .") , and the doctrine that "if the language of [an insurance] policy is doubtful or uncertain in its meaning, any ambiguity must be resolved in favor of the insured and against the insurer," <u>Pepsico, Inc. v. Winterthur International American Insurance Co.</u>, 13 A.D.3d 599, 600, 788 N.Y.S.2d 142, 144 (2d Dep't 2004) (internal quotation marks omitted).[6]

C.   <u>Clauses 52 and 53</u>

The second issue on which MCC asks for summary judgment appears to be intertwined with the issue presented in AGCS' cross-motion.  MCC originally sought a ruling that the Policy "cover[s] losses due to theft[,] even where the cargo is stolen through trick, deceit and false pretenses." (Pl. Memo. at 14).   AGCS concedes this point, stating that

> MCC misconstrues AGCS' defense to coverage under Clause 52. . . . AGCS acknowledges that an all-risks policy covers theft and theft by trickery unless otherwise excluded.  The basis of AGCS' defense to coverage under Clause 52, as well as the [P]olicy in general, is that MCC cannot meet its <u>prima facie</u> burden of establishing the existence of "goods insured," that it had an insurable interest in "goods insured" and that there was a physical loss of "goods insured" because the cargo of copper scrap never existed.[7]

---

[6] In denying MCC's motion for summary judgment on this ground, I express no opinion on whether the Infidelity Exclusion will ultimately apply.  The consequence of this ruling, however, is that AGCS will be able to take discovery on issues such as whether Riverbend was a party of interest to the underlying transaction and what, precisely, constituted that transaction.

[7] AGCS comments that Riverbend "never intended to deliver the cargo under its contract with McQan." (Def. Memo. at 13).  MCC interprets this as an argument "that the particular trickery []

(Def. Memo. at 1 (footnote omitted)).  In other words, while AGCS concedes that MCC may have been defrauded, thereby suffering a financial loss, it disputes whether there was any property loss as would be necessary to trigger coverage under the Policy.  The argument regarding MCC's prima facie burden is also the basis for ACGS' cross-motion, which "seeks a [ruling] declaring that MCC must demonstrate the existence of 'goods insured,' that MCC had an insurable interest in 'goods insured' and that there was a physical loss of 'goods insured' in order to trigger coverage under Clauses 52 and 53."  (Def. Memo. at 1-2).  Both MCC's reply submission on its own motion and its opposition to AGCS' cross-motion focus on this issue.  I will therefore address the second branch of MCC's motion in tandem with AGCS' cross-motion.

Generally, an "all-risk insured[] has the burden of establishing a prima facie case for recovery by proving (1) the existence of an all-risk policy, (2) an insurable interest in the subject of the insurance contract, and (3) the fortuitous loss of the covered property."  International Multifoods Corp. v. Commercial Union Insurance Co., 309 F.3d 76, 83 (2d Cir. 2002) (internal quotation marks omitted); Farr Man Coffee Inc. v. Chester, No. 88 Civ. 1692, 1993 WL 248799, at *21 (S.D.N.Y. June 28, 1993).  For the purposes of this case, the second requirement

---

allege[d] in this case is not covered due to Riverbend's alleged intent to steal all along." (Pl. Reply at 6).  I do not construe ACGS' observation about Riverbend's intent as undermining its concession that theft by trickery is covered unless specifically excluded.  I therefore find the comment irrelevant to the present motions.

can be subdivided into two parts -- (a) a showing that goods that are the "subject of the insurance contract" existed and (b) a showing that MCC had an insurable interest in those goods.

As noted above, the Policy includes a provision admitting that MCC has an insurable interest in the goods insured under the Policy during their transit. Policies including such provisions -- called "Policy Proof of Interest" or "Full Interest Admitted" provisions -- are known as "honor" policies. See Lenfest v. Coldwell, 525 F.2d 717, 720 n.4 (2d Cir. 1975); Thomas J. Schoenbaum, 2 Admiralty & Mar. Law § 19-13 (5th ed.). Pursuant to such provisions, the insurer admits to the insured's financial interest in the property so that "no [] proof of such interest [other than the policy itself] need be submitted by the assured to collect a covered loss." Glossary of Marine Insurance and Shipping Terms, 14 U.S.F. Mar. L.J. 305, 315, 389 (2002). Although at least one nation has outlawed all such policies as wagering contracts because they do not, on their face, require an interest in the subject of the policy, such provisions can be enforced in the United States. See, e.g., Lenfest, 525 F.2d at 720 n.4; Republic of China v. National Union Fire Insurance Co. of Pittsburgh, Pennsylvania, 163 F. Supp. 812, 816 n.1 (D. Md. 1958); Robert Bocko et. al., Marine Insurance Survey: A Comparison of United States Law to the Marine Insurance Act of 1906, 20 Tul. Mar. L.J. 5, 8 (1995) ("Marine Insurance Survey"). To protect against enforcement of a policy in which the insured has no interest in the property lost, the "insurer may avoid liability by establishing that the assured did not have an

16

insurable interest in the subject-matter." Marine Insurance Survey, 20 Tul. Mar. L.J. at 8; see also Lenfest, 525 F.2d at 720 n.4 ("In the United States 'honor' policies are not necessarily binding, and the insurer may affirmatively show the absence of an insurable interest."). Thus, where an honor policy applies to the goods at issue, the insured need not establish an insurable interest; instead, the insurer has the opportunity to show the absence of such an interest. Therefore, if the conditions of the Insurable Interest Admitted provision are met, to establish its prima facie case, MCC must show the existence of the policy; the existence of some amount goods that (preliminarily, at least) are within the ambit of the Policy; and the "fortuitous loss" of those goods. AGCS may endeavor to defeat coverage by showing that MCC did not have an insurable interest in the goods. AGCS is not, therefore, entitled to the decree it seeks regarding MCC's prima facie case.

Similarly, the second branch of MCC's motion is also denied. To the extent that MCC requests a ruling that the Policy covers "losses due to theft . . . through trick, deceit and false pretenses" (Pl. Memo. at 14), AGCS has disavowed this defense, admitting that "an all-risks policy covers theft and theft by trickery, unless otherwise excluded" (Def. Memo. at 1), so the request appears to be moot. If MCC seeks instead a ruling that it has established its prima facie case, the motion is premature for reasons similar to those discussed in connection with the Infidelity Exclusion: discovery has not officially commenced, and

AGCS should have the opportunity to uncover facts relevant to those issues on which it has the burden of proof, such as the question of MCC's insurable interest in the copper wire scrap, and its other defenses.[8]

## Conclusion

For the foregoing reasons, MCC's Motion for Summary Judgment on Allianz' Defenses Regarding Theft with Fraudulent Intent and the "Infidelity" Exclusion (Docket no. 23) and AGCS' Cross-Motion for Summary Judgment on the Interpretation of Clauses 52 and 53 (Docket no. 31) are both denied. The parties shall contact my chambers within fourteen days of the date of this Order to schedule a conference to set discovery and other deadlines.

SO ORDERED.

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York
       June 8, 2015

Copies transmitted this date:

Joshua Gold, Esq.
Dennis J. Nolan. Esq.
Bruce E. Strong, Esq.
Anderson Kill, P.C.
1251 Avenue of the Americas
New York, NY 10020

---

[8] Because I have resolved the motions on grounds that do not require an evaluation of the evidence presented in the parties' Rule 56.1 statements, I do not address AGCS' objections to the admissibility of the Preliminary Investigation Report. (Def. Memo. at 4-9).

John A.V. Nicoletti, Esq.
Kevin J.B. O'Malley, Esq.
Nooshin Namazi, Esq.
Nicoletti Hornig & Sweeney
88 Pine St., 7th Floor
New York, NY 10005